Will. H. Tuck.

Jas. L. Bartol.
</div>

(Decided February 7th, 1860.)

## The Mayor & City Council of Baltimore *vs.* The State, on the relation of the Board of Police of the City of Baltimore:—Mayor & City Council of Baltimore *vs.* Charles Howard and others.

The Act of 1860, ch. 7, repealing certain laws relating to the Police of the city of Baltimore, and amending certain provisions of the city charter relating to the police and general powers of the Mayor and City Council, and providing a permanent police for the city, under the control of a Board of Police, consisting of commissioners appointed by the Legislature, is constitutional and valid.

In cases of *doubt* on the question of *power* in the Legislature to pass a law, the courts ought not to interfere and pronounce it unconstitutional; they cannot do so without assuming (where it does not clearly appear) that the Constitution has been violated.

The power of appointment to office is not, under our systems of checks and balances in the distributions of powers, where the people are the source and fountain of government, a function intrinsically executive, in the sense that it is inherent in, and necessarily belongs to, the executive department.

Mayor, &c., of Balto. vs. State, ex rel. of the Board of Police of Balto.

Our form of government in its various changes has never recognised the power of appointment to office as an executive prerogative; the Constitution so far from treating it as an inherent executive power indicates that it belongs where the people choose to place it.

The 6th Art. of the Bill of Rights, "that the legislative, executive and judicial powers of government ought to be forever separate and distinct from each other, and no person exercising the functions of one of said departments shall assume or discharge the duties of any other," is not to be interpreted as enjoining a complete separation between these several departments.

Such complete separation has never practically existed in any of the States in whose fundamental law this principle has been asserted; in this State there are numerous instances of laws affording relief where the judiciary possessed ample jurisdiction over the subject matter, and instances of appointments to office, by the Legislature, are equally numerous.

Such legislation is evidence of co-temporaneous construction and acquiescence of the people, and the various departments, in this practical interpretation, and the Constitution may receive an interpretation from a long, constant and uniform legislative practice.

The Bill of Rights is not to be construed by itself according to its literal meaning; it and the Constitution compose our form of government and they must be interpreted as one instrument; the former announces principles on which the government about to be established, will be based; if they differ, the Constitution must be taken as a limitation or qualification of the general principles previously declared, according to the subject and the language employed.

The design of Art. 6, of the Bill of Rights, was to ingraft the principles there announced, on our system, only as far as comported with free government, as an inhibition upon the exercise by one department of powers conferred on any other by the Constitution, restraining each branch within its appropriate sphere, by forbidding to it the use of powers allotted to the co-ordinate departments.

If the power of appointing officers to offices created by law, is conferred by the Constitution on any other branch of the government, the Legislature cannot exercise such power, and the law would be void, but if the power is given to the Legislature, it may be exercised notwithstanding the 6th Art. of the Bill of Rights

Sec. 11, of Art. 2, of the Constitution, confers on the executive the appointment of all officers not otherwise provided for, "unless a different mode of appointment be prescribed by the law creating the office," and under this the Legislature may, itself, designate the officers in the law creating the offices.

The Constitution must receive an interpretation according to the sense in which the people are supposed to have understood its language, but it

ought also to be considered with reference to the previous legislation of the State.

The power of appointment to offices created by law, having been exercised by the Legislature, from the earliest period of the government, in the absence of any prohibition in the Constitution, express or implied, it is to be presumed that the people intended the Legislature should continue to exercise the power.

While the motives of the Legislature can have no effect upon the efficiency of laws, neither can they be regarded by the judiciary when testing the power of the Legislature to pass them.

The fact that the Constitution mentions and recognises the Municipal Corporation of the city of Baltimore, does not make the charter of the city a constitutional charter, so as to place it beyond the reach of legislative power.

The city of Baltimore and the counties are public territorial divisions of the State, established for public political purposes connected with the administration of the government, possessing the character, and endowed with the powers of corporations, acccording to the laws severally applicable to each.

The city of Baltimore and the counties are mere instruments of government appointed to aid in the administration of public affairs, and are parts of the State; as public corporations they are to be governed according to the laws of the land, and are subject to the control of the Legislature.

The provision in the Police law, which transfers to the commissioners, for the purposes of the new police, the use of the fire alarm telegraph, station houses, &c., provided by the city, as fully and to the same extent as the same are now, or may be, used by or for the city police, is constitutional and valid.

Such a provision merely takes city property dedicated to particular public uses and applies it to the same purposes, by only changing the agency by which the use is to be directed; the character of the property is not changed nor the title; no matter by whom managed, it remains public, devoted to public use, and all the while belongs to the city.

Art. 4, sec. 19, of the Constitution, after providing for the election of justices and constables for the counties and city of Baltimore, and declaring them to be, by virtue of their offices, conservators of the peace, in the counties and city respectively, concludes thus: "And the Mayor and City Council may provide, by ordinance, from time to time, for the creation and government of such temporary additional police as they may deem necessary to preserve the public peace." HELD:

That the police which the city authorities are hereby empowered to create is to be additional to the police system then in operation, and such as might thereafter be established by law, and not to the justices and constables mentioned in this section.

Mayor, &c., of Balto. *vs.* State, *ex rel.* of the Board of Police of Balto.

It is not made the duty, nor is it within the nature of his office, that a justice of the peace, or a constable, should perform police duty, other than such as looks to the preservation of the peace.

The power to govern belongs to the people, and it is their duty to exercise it for the common good, and being under that obligation, it is not to be assumed that they have impaired the means of performing the duty by parting with the power to any division of the body politic.

The power to levy taxes is a sovereign power, and unless committed to some portion of the people, may be exercised by the Legislature, and it is not to be considered as parted with by mere construction.

The power to levy taxes may be delegated by the Legislature to commissioners, or any other agents, and when the Legislature provides for a tax by any agency whatever, it is, in contemplation of the Constitution, the act of the people.

The power given to the commissioners to issue, in certain contingencies, certificates of indebtedness in the name of the Mayor and City Council, bearing interest, with power to pledge and dispose of them, is not in violation of that clause of Art. 1, sec. 10, of the Constitution of the United States, which declares that no State shall "remit bills of credit."

There is no injustice, nor defect of law, in authorising such certificates to be received in payment of taxes; such mode of payment of public taxes has heretofore been practiced in this State.

The provision making it the duty of the sheriff, when called on, to act under the Board of Police, in the preservation of the public peace, and to call out the *posse*, if required by them, and hold it subject to their direction, is no valid objection to the law, nor would it vitiate the law if the objection were sustained.

The Constitution mentions the office of Sheriff, and provides for filling it, but does not specify or describe his powers and duties; these are left to the common law and the Acts of Assembly and may be changed by law.

The power given to the Board of Police to call out the military force of the city to aid in preventing threatened disorder, or to suppress insurrection, riot or disorder, is no valid objection to the law, nor would it vitiate the law if the objection were sustained.

There is nothing in such a provision, nor in this law, which abridges the constitutional power of the Governor to call out the militia to repel invasion, suppress insurrections, and enforce the laws.

The proviso, declaring "that no Black Republican, or endorser or approver of the Helper Book," shall be appointed to any office under the board, is unconstitutional, if it is to be understood that that class of persons are proscribed on account of their political or religious opinion, but as the court cannot officially understand who are meant to be affected by the proviso, no judicial opinion can be expressed on the question.

Mayor, &c., of Balto. *vs.* State, *ex rel.* of the Board of Police of Balto.

As to the effect of the clause which disqualifies from holding any office under the Mayor and City Council of Baltimore, such persons as shall forcibly resist the provision of this law, the judges are equally divided in opinion.

The provision making the commissioners part of the city authorities, and making the city responsible for their acts, is no valid objection to the power of the Legislature so to provide, and if the objection should prevail, it would not defeat the law.

The doctrines, that there is a fundamental principle of right and justice, inherent in the nature and spirit of the social compact, that rises above and restrains the power of legislation, cannot be applied to the Legislature when exercising its sovereignty over public charters, granted for the purpose of government.

The principle above stated, with the limitation that it is designed to protect the life, liberty and property of the citizen from violation in the unjust exercise of legislative power, asserts a very correct doctrine.

APPEALS from the Superior Court of Baltimore city.

The question involved in these cases, is the constitutionality of the Act of 1860, ch. 7, amending certain sections of the Code of Public Local Laws, relating to the police and general powers of the Mayor and City Council of Baltimore, and repealing other sections, relating to the police of said city, and the power of the Mayor and City Council to establish and regulate the same, and inserting in lieu thereof sections for the purpose of providing a permanent police for the city of Baltimore.

In the *first* case, the four commissioners appointed by the 4th section of this Act, and constituting the Board of Police of the city of Baltimore, filed, in the name of the State, their petitions in the court below, on the 10th of February 1860, in accordance with the provisions of the 12th section of said Act, praying the court to "issue the writ of *mandamus* to the Mayor and City Council of Baltimore, commanding and enjoining them, the said Mayor and City Council, immediately after the receipt thereof, and without delay, to furnish and allow to the Board of Police of the city of Baltimore, for the police now under its exclusive management and control, as well the use of the fire alarm and police telegraph in said city, as of all the station houses, watch boxes, arms,

DECEMBER TERM, 1859.    381

Mayor, &c., of Balto. *vs.* State, *ex rel.* of the Board of Police of Balto.

accoutrements, and other accommodations and things, provided by the said Mayor and City Council of Baltimore for the use and service of the police created by it, as fully and to the same extent as the same, at the time of the passage of said Act, were or might be used by or for the said city police." To this petition an answer was filed by the Mayor and City Council of Baltimore, denying, upon various grounds, the constitutionality of this law, and to this answer a general demurrer was filed by the relators.

In the *second* case, a petition was filed on the 27th of February 1860, by the Mayor and City Council of Baltimore, praying, for the reasons therein stated, that this Act may be declared unconstitutional and void, and that the Commissioners therein named, and the Board of Police thereby intended to be created, may be restrained, prevented and prohibited, by a writ of *mandamus*, from exercising, or assuming to exercise, any of the powers, authority or jurisdiction intended to be thereby conferred on them, and that a rule may be laid upon said Commissioners to show cause why such a writ of *mandamus* should not issue. The rule was laid, and the Commissioners in their answer showed cause, denying that the petitioners, upon the case made in their petition, have any right or title to the relief thereby prayed.

The provisions of this Act, and the grounds upon which it was alleged to be unconstitutional, are sufficiently stated in the opinion of the court below, the arguments of counsel and the opinions of this court. The case was argued in the court below, by *William H. Norris* and *Reverdy Johnson* for the relators, and by *William Price* and *Jonathan Meredith* for the Mayor and City Council, and the following opinion of that court was delivered by MARTIN, J.:

"The general question presented for my consideration in this case, is, whether the Act of the General Assembly of this State, passed at its late session, for the purpose of creating a permanent police for the city of Baltimore, is to be treated by the court as a valid exercise of legislative power. It is a question, not of expediency or policy, but of power, the mag-

nitude of which has not been overstated. That it is a question in reference to which there may exist a conscientious difference of opinion, must be admitted. This is manifest from the argument at the bar. It is not to be supposed that eminent counsel would, on so grave a question of constitutional law, espouse a principle, or advocate a doctrine, in the correctness of which they did not sincerely believe; and yet upon this question we find the leaders of the bar divided in opinion. On the one side it is said that the chartered rights of a large, prosperous city, have been invaded by a legislative enactment which has no warrant in the Constitution, and, upon the other side, it is contended that the General Assembly of the State, in re-arranging the police powers of the city, has only exercised that supervision and control which belonged to that body, by virtue of its controlling power over all the municipal corporations of the State. These conflicting claims and discordant opinions, can only be adjusted by the judicial tribunals of the State. I am aware of the importance of the question to be decided, and the opinion which I am about to pronounce is the result of a calm, dispassionate and deliberate examination of the whole subject.

" It is perfectly manifest that any right which the Mayor and City Council of Baltimore may possess, to the exclusive exercise of the police powers of the city, must be derived either from a legislative grant or grants, or that right must be secured by the Constitution. The tenure by which those powers are held, must be either a legislative or a constitutional tenure; and the questions to be considered are: first, what is the scope and extent of the authority of the General Assembly over the Mayor and City Council, with respect to these police powers as statutory, delegated powers, irrespective of the nineteenth section of the fourth Article of the Constitution of the State? And, secondly, what is the operation and effect of that section as a restraining prohibition upon the general legislative power? These are the prominent questions upon which the whole controversy turns, and have been argued by the respective counsel with unsurpassed ability. It may be conceded that the city of Baltimore has been recognized by

the existing Constitution as one of the territorial divisions of the State, occupying, politically, the rank and position of a county, and, as such, entitled to be represented in the General Assembly. But Baltimore is still a municipal corporation, created by the government for political purposes, as counties, towns and villages are created, and, as such, invested with subordinate, local, delegated, legislative powers, to be exercised for the promotion of the public good, subject always to the supervision and control of the legislative power as the parent power, (9 *G. & J.*, 397.) All the power of the corporation emanates from the State; and when a tax is imposed by the Mayor and City Council, or a police power is exerted, it is the action of the State operating through the instrumentality of its municipal agent.

"The city of Baltimore is a political community, but not a distinct community. The city is an integral part of the State, or a portion of the body politic—one of the branches of the government, (8 *Md. Rep.*, 102,) and constituted a political agent by the State, for the more efficient and convenient exercise of the police powers of the government; and it is a clear proposition that the power to employ any agent for these political objects, includes the power to substitute one municipal agent for another. In the case of a municipal corporation, the visitorial power resides in the State, and the State has the exclusive right, as the trustee of the public interest, to inspect, regulate, control and direct the corporation and its funds and franchises, because the whole interest and franchises are conferred for the public use and advantage. Such corporations are always governed according to the law of the land, (2 *Kent*, 353; 9 *G. & J.*, 401.) The power in the Legislature to repeal or modify the local legislative powers delegated to these municipal corporations, involves no violation of the obligation of a contract within the purview of the tenth section of the first Article of the Constitution of the United States, for in these corporations the State is the only party, and the corporate authorities are merely trustees for the public, (2 *Kent*, 358.) There is no vested right to be disturbed, for the Mayor and City Council can have, as against

the State, no vested right to retain, undiminished, those lo-
cal powers of legislation antecedently delegated by the charter
and its supplements, because those powers were conferred by
the State upon the city authorities, as its municipal agent
created for purposes connected with the administration of the
government.

"Besides, it is a great mistake to suppose that the absence
or the existence of authority in the Legislature to repeal or
modify the police powers which may have been, from time
to time, delegated to the Mayor and City Council, depends
upon the fact that the city had been chartered or incorpo-
rated. The incorporating Act neither gives nor prevents this
control. The controlling power of the Legislature stands on
the proposition that this municipal corporation is an instru-
ment of the State, created for its own purposes. In the case
of *Dartmouth College vs. Woodward,* 4 *Wheat.,* 638, *Mr.
Chief Justice Marshall* says: 'From the fact, then, that a
charter of incorporation has been granted, nothing can be in-
ferred which changes the character of the institution, or trans-
fers to the government any new power over it. The charac-
ter of civil institutions does not grow out of their incorporation,
but out of the manner in which they are formed, and the ob-
jects for which they are created. The right to change them
is not founded on their being incorporated, but on their being
the instruments of government, created for its purposes. The
same institutions, created for the same objects, though not in-
corporated, would be public institutions, and, of course, con-
trollable by the Legislature. The incorporating Act neither
gives nor prevents this control.'

"It will be found that the principles thus stated are sup-
ported by an unbroken series of adjudications which it is im-
possible to resist. In the case of the *State vs. The Balto. &
Ohio Railroad Co.,* 12 *G. & J.,* 436, *Judge Stephen,* speak-
ing for the Court of Appeals, uses this language:

"'Washington county is an integral part of the State, or
portion of the body politic, and the money, if received by
her, would belong to her as public property in her public po-
litical capacity, to be applied exclusively to the public use.

As a county, she stands to the State in the relation of a child to a parent, subject, in all respects, to its jurisdiction and power, as well as entitled to the benefits of its fostering care and protection. As a member of the political family she has a right to participate in the legislative councils of the country; but the will of the majority, when expressed according to the forms of the Constitution, is binding and obligatory upon her; and to that will, as the rule of her conduct, she is bound to submit with becoming deference and respect.'

"I quote the opinion of *Mr. Chief Justice Taney* in the same case, as reported in 3 *How.*, 550. In speaking of the Commissioners of Washington county, he says:

"'As relates to the Commissioners, they are not named in the law, nor were they in any shape parties to the contract supposed to have been made, nor is the money declared to be for their use. They are a corporate body it is true, and the members who compose it are chosen by the people of the county. But, like similar corporations in every other county in the State, it is created for the purpose of government, and clothed with certain defined and limited powers to enable it to perform those public duties which, according to the law and usages of the State, are always entrusted to local county tribunals. But however chosen, their powers and duties depend on the will of the Legislature, and are modified and changed, and the manner of their appointment regulated at the pleasure of the State.'

In the case of *Dartmouth College vs. Woodward, 4 Wheat., Mr. Justice Story,* at page 671, uses this strong language:

"'When the corporation is said at the bar to be public, it is not merely meant that the whole community may be the proper objects of the bounty, but that the government have the sole right, as trustees of the public interests, to regulate, control and direct, the corporation and its funds and its franchises at its own good will and pleasure. Now such authority does not exist in the government, except where the corporation is in the strictest sense public; that is, where its whole interests and franchises are the exclusive property and domain of the government itself.'

49    v. 15

"The same principle is asserted by *Mr. Justice Washington* at page 660; and in the case of the *Regents of the University of Maryland vs. Williams,* 9 *G. & J.,* 397, the Court of Appeals say: 'A public corporation is one that is created for political purposes, with political powers, to be exercised for purposes connected with the public good in the administration of the civil government; an instrument of the government, subject to the control of the Legislature, and its members officers of the government for the administration or discharge of public duties, as in the case of cities, towns,' &c.

" In speaking of East Hartford as a municipal corporation, *Mr. Justice Woodbury,* at page 534, 10 *How.,* uses this clear and strong language:

" ' The grantees likewise, the towns, being mere organizations for political purposes, were liable to have *their* public powers, rights and duties modified or abolished at any moment by the Legislature. They are incorporated for public and not private objects. They are allowed to hold privileges or property only for public purposes. The members are not shareholders nor joint partners in any corporate estate which they can sell, or which can be attached and levied on for their debts. Hence, generally, the doings between them and the Legislature are in the nature of legislation rather than compact, and subject to all the legislative conditions just named, and therefore to be considered as not violated by subsequent legislative changes. It is hardly possible to conceive the grounds on which a different result could be vindicated, without destroying all legislative sovereignty and checking most legislative improvements and amendments, as well as supervision over its subordinate public bodies. Thus, one of the highest attributes and duties of a Legislature is to regulate public matters with all public bodies, no less than the community from time to time, in the manner which the public welfare may appear to demand.'

" It is not necessary to vindicate the position assumed on this branch of the case by the counsel for the relators, to maintain that the Legislature is invested with the authority to annul or abolish the charter of the city. The franchise of governing the city through the instrumentality of a Mayor

and City Council, is, 1 think, secured and recognized by the Constitution. But this franchise of passing ordinances and exercising local legislative powers for the government of the municipalty is subject to the control of the sovereign power of the State. It is apparent from the passage already quoted from the opinion of *Mr. Chief Justice Marshall,* at page 638 of 4 *Wheat.,* that the incorporating Act neither gives nor prevents this control. I consider, then, that the authority of the Legislature to repeal the police powers heretofore delegated to the Mayor and City Council, and to invest those powers in the Board of Commissioners, created by the bill, is clearly established by the cases to which I have referred, unless that authority has been restrained or prohibited by the 19th section of the 4th Article of the Constitution.

"This presents, for my consideration, the proposition upon which it has been said the counsel for the respondents mainly rely. It is this: That the whole ground covered by the bill, is already pre-occupied by the Constitution. That to make room for the bill, it will be necessary to displace the entire arrangement made of the same subject by the Constitution itself. That by the very terms of the Act, the legislative police is made to extinguish the constitutional police of the city of Baltimore, which cannot be done unless the law is held to be superior to the Constitution. In considering this question, it is necessary to inquire into the nature and extent of the power of the General Assembly of the State. By the 1st section of the 3rd Article of the Constitution, it is declared that the Legislature shall consist of two distinct branches, a Senate and a House of Delegates, which shall be styled 'The General Assembly of Maryland.' There is no grant of power to the Legislature, because none was necessary. This Article of the Constitution is employed with the organization of the Legislature, the authority of its separate branches, and the privileges of its members. The framers of that instrument, and the people who adopted it, assumed that all power was inherent in the Legislature, as the representatives of the people, unless it was prohibited by the Constitution or the Bill of Rights, or was vested in some other department of the government, (*Pratt vs. Allen,* 13 *Conn.,* 125.)

" When the inquiry is, whether a particular power is possessed by the Legislature, it is answered by ascertaining, not whether the power has been granted, but whether it has been prohibited.    The power of the General Government, in this respect, is entirely unlike the State power.    Congress, it is true, is supreme within the sphere of its powers, but it has no powers except such as are enumerated, defined and specifically granted; and so anxious were the framers of the Constitution of the United States to guard against the necessity of resorting to implied or constructive powers, that after granting to Congresss pecifically certain powers carefully enumerated in various subdivisions, it confers expressly the power to make all laws that may be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Constitution in the Government of the United States, or any department or officer thereof; and it is clear that when a power is used by Congress as an auxiliary power necessary and proper to execute some one of the specifically granted powers, it does not stand merely upon the ground of implication, but is covered by this express grant.

"I do not mean, of course, to say, that the power to pass any law which might be necessary and proper to carry into execution any one of the granted powers, could not be implied in the absence of an express grant, but that this clause was inserted, *ex industria*, to obviate the necessity of resorting to constructive powers, and an examination of the Constitution of the United States and the Constitution of the State, will show a disposition on the part of the framers of those instruments, and the people who adopted them, to abstain, as far as practicable, from the grant, or the relinquishment of powers by implication; a principle always to be regarded when the court is considering whether a particular power has been granted or surrendered by the people in their fundamental law.    But when the validity of a particular power exercised by the General Assembly of the State, is contested, it is not necessary to show that the power was granted by the Constitution.    Those who dispute the power must establish affirmatively and clearly, that it has been denied.    It is pre-

sumed to be valid. The Legislature is the depository of the power of the people, and you cannot curtail the authority of the Legislature without diminishing the power of the people.

"It is upon this ground, as well as from a becoming respect for the action of a co-ordinate department of the government, that the courts have uniformly declared that in no doubtful case would they pronounce a legislative act to be contrary to the Constitution. (*Fletcher vs. Peck*, 6 *Cranch*, 128. *Calder vs. Bull*, 3 *Dallas*, 386. 4 *Wheat.*, 608. 12 *G. & J.*, 438.) In reference, therefore, to the question, whether this Act is to be treated as unconstitutional, I assume that the Legislature is to be considered in the possession of all powers properly legislative, so far as the Constitution of the State is concerned, which has not been by that Constitution prohibited expressly or by necessary implication. I say all power properly legislative, for to transfer the property of one individual to another, or to make a man a judge in his own cause, is not the exercise of legislative power. But this principle, as we have seen from the authorities, has no application to the case of a municipal corporation. (9 *G. & J.*, 365. 12 *G. & J.*, 436. 3 *How.*, 550.)

"It is not contended that the power exercised by the Legislature in creating a permanent police for the city of Baltimore, has been expressly prohibited by the Constitution, and the question is, whether it is to be regarded as a power prohibited by implication, and the question which stands in advance of all other questions on this branch of the case is, whether a power of this description (the police power) can be considered as relinquished by the people by mere implication. Can you predicate of the people, in forming their Constitution, the intention to abdicate a power like this?

"What is the police power? I do not speak of this power in its largest sense, but in the sense in which it is to be understood in connection with a subject like the one now under consideration. It is emphatically a State power, one of the attributes of sovereignty; and in the nature of things it is a power which the Legislature should have the means of expanding to meet all the varied and changing wants of the

community. No duty, the Judge says, in the case of *The People vs. Draper*, 25 *Barb.*, 374, when speaking of the police power of the State, or sovereignty, is more general or comprehensive in its nature than the duty of preserving the peace throughout its territory, of preventing crime, protecting the right of persons and property, guarding the public health, preserving order at elections, and the other numerous duties provided for by the Act before him, and enjoined upon the public officers. It is a mistake to suppose that the police duty imposed upon these Commissioners is limited to the preservation of the public peace. They are required by the 5th section of the Act to preserve the public peace, prevent crime, and arrest offenders, protect the rights of person and property, guard the public health, to preserve order at every public election, and at all public meetings and places, and on all public occasions, prevent and remove nuisances in the streets, highways, waters and other places, provide a proper police force for every fire, for the protection of firemen and property, protect strangers, emigrants and travelers at steamboats, ship-landings and railway stations, see that all laws relating to elections, and to the observance of Sunday, and regarding pawnbrokers, gambling, intemperance, lotteries and lottery policies, vagrants, disorderly persons and free negroes, and the public health, are enforced, and also enforce all laws and all ordinances of the Mayor and City Council of Baltimore, not inconsistent with the provisions of this Article, or any other law of the State, which may be properly enforceable by a police force.

"This is the character of the power involved in this controversy, and the question is, whether it is not be regarded as a vital power which the whole community is interested in retaining undiminished?—within the principle established by the Supreme Court in the case of the *Providence Bank vs. Billings & Pittman*, 4 *Pet.*, 514, and in the case of *Charles River Bridge vs. Warren Bridge*, 11 *Pet.*, 547, that where the power is of that kind which the people are interested in preserving undiminished, there can be no assumed abandonment of that power.

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

"In the case of the *Bank of Providence vs. Billing &*
*Pittman,* it appeared that the Legislature of Rhode Island
had chartered a bank in the usual form of such acts of in-
corporation.   The charter contained no reservation on the
part of the State that it would not impose a tax on the bank,
nor any restriction of the right to do so.   It was silent on the
subject.   Afterwards a law was passed imposing a tax on all
banks in the State, and the right to impose this tax was re-
sisted by the bank upon the ground, that if the State could
impose a tax it might tax so heavily as to render the fran-
chise of no value, and thus to destroy the institution; that
the charter was a contract, and that a power which may in
effect destroy the charter was inconsistent with it, and is im-
pliedly renounced by granting it.

"But the court said the taxing power was of vital impor-
tance and essential to the existence of the government, and
the relinquishment of such a power is never to be assumed,
and in delivering the opinion of the court, *Mr. Chief Justice*
*Marshall* says, in speaking of the taxing power: 'As the
whole community is interested in retaining it undiminished,
that community has a right to insist that its abandonment
ought not to be presumed in a case in which the deliberate
purpose of the State to abandon it does not appear.'

"In the case of *Charles River Bridge vs. Warren Bridge,*
the question was, whether the State could be presumed
to have surrendered, by granting a charter, one of its police
powers?   The court considered the case before them in prin-
ciple precisely similar to that of the *Providence Bank vs.*
*Billings & Pittman.   Mr. Chief Justice Taney,* in deliver-
ing the opinion, says: 'It may perhaps be said that in the
case of the Providence Bank this court were speaking of the
taxing power, which is of vital importance to the very exist-
ence of the government.   But the object and end of all gov-
ernment is to promote the happiness of the community by
which it is established, and it never can be assumed that the
government intended to diminish its power of accomplish-
ing the end for which it was created.'

" 'A State ought never to be presumed to surrender this

power because, like the taxing power, the whole community have an interest in preserving it undiminished.'

"If it be true, then, that the Legislature when in the possession of a power of this description is never to be presumed to have surrendered it, because the whole community is interested in preserving it undiminished, it is equally true that the people in adopting their Constitution are not to be presumed to have abdicated it. The police power includes the power to pass sanitary and other police laws, and to select the agents by whom those laws are to be executed; these powers are necessarily connected. To render a power of this character efficient, the body in whom it resides must have the authority to modify it to meet the changing circumstances of the community upon whom it operates; this is not the business of a Constitution, which deals only with general principles and fundamental rules; and even if it could be assumed that by the 19th section of the 4th Article, the Justices of the Peace and the Constables were converted into police officers, and a police force thus created for the counties and the city of Baltimore, it might well be doubted if, from an arrangement of this kind in the Constitution, an intention in the people to withhold this power from the Legislature could be inferred. But the interpretation placed by the counsel for the respondents upon this section of the Constitution cannot be maintained. That it was not the purpose of the Constitution, by this provision, to exhaust the whole police power of the State, is obvious from the fact that the 19th section provides only for the preservation of the public peace. This is one of the objects to be accomplished by the creation of a police force, but it is only one of those objects; and as the police force supposed to be created by this section is limited to the preservation of the public peace, if it be true that the whole police power of the State is exhausted and the Legislature thus impliedly prohibited from exercising this power, it must follow that there is a large and important class of police duties, with respect both to the city and counties, for which the Legislature can make no provision. Such a proposition, I think, inadmissible.

"But this section was not inserted in the Constitution for the purpose of creating a police force for the city, or for the counties; it was framed with a different purpose. The object was to organize subordinate judges, with a limited jurisdiction, and to provide them, in the constables, with executive officers who bear the same relation to the justices of the peace that the Sheriffs bear to the courts. This section is therefore found in that Article of the Constitution, which provides for the organization of the judiciary department, and declares that the judicial power of the State shall be vested in a Court of Appeals, in Circuit Courts, in such courts for the city of Baltimore as may be hereinafter prescribed, and in Justices of the Peace.

"The general duties of a police officer are manifestly unsuited to, and inconsistent with, the official duties of the justices of the peace and the constables, and when it is declared that they shall have such duties and compensation as now exist, or may be provided for by law, the purpose was to authorise the Legislature to impose such new duties as were compatible with the duties which had already been assigned to them.

"It is declared that they shall be, by virtue of their offices, conservators of the peace for the counties and city, respectively, but this was an act of supererogation, and was inserted from abundant caution, for both the justices of the peace and the constables, would be ex officio conservators of the peace, in the absence of any provision of this kind in the Constitution.

"That portion of the 19th section, which declares that the Mayor and City Council of Baltimore may provide, from time to time, for the creation and government of such temporary and additional police as they deem necessary to preserve the public peace, cannot be regarded, I think, as covering the whole field of the police power within the city of Baltimore.

"The force which the city authorities are thus authorised to create, was confined to the preservation of the public peace; it was to be temporary in its nature, and to be organized, or

diminished as the public exigencies might require, and the force to which it was to be attached as an additional force, was the police force in existence at the time the Constitution went into operation, and which had been created under the Acts of Assembly, and the ordinances of the city previously passed. I think, therefore, that the General Assembly, in passing this Act creating a permanent police for the city of Baltimore, are not to be considered as having transcended their constitutional authority.

"The next question to be considered is, whether the appointment by the Legislature of the relators as commissioners of this Board of Police, is in conflict with the 11th section of the 2nd Article of the Constitution, which declares that the Governor shall nominate, and by and with the advice of the Senate, appoint all civil and military officers of the State, whose appointment or election is not otherwise herein provided for, unless a different mode of appointment is prescribed by the law creating the office? I think not, as the office in contest was created by law. This question cannot be considered as open, since the decision of the Court of Appeals in the case of *Davis vs. The State*, 7 *Md. Rep.*, 161. I quote the opinion of the court, as one which I adopt as containing the true exposition of this provision of the Constitution, and covering the whole proposition.

"The court says: 'The appellant contends that the law of 1854 is unconstitutional and void, inasmuch as it seeks to take from the Governor the appointment of the inspector; and Article 2 and section 11 of the Constitution, is relied on to support this position. That section provides that the Governor shall appoint all officers, whose appointment or election is not otherwise herein provided for, unless a different mode of appointment be prescribed by the law creating the office. In a few words, we think this provision means simply that the Governor shall have power to fill all offices in the State, whether created by the Constitution or by the Act of Assembly, unless otherwise provided by the one or the other; therefore when the Legislature has created an office by Act of Assembly, the Legislature can designate by whom and in what

DECEMBER TERM, 1859.      395

Mayor, &c., of Balto. *vs.* State, *ex rel.* of the Board of Police of Balto.

manner the person who is to fill the office shall be appointed. If the source of the appointment is not thus designated, the Governor by virtue of the above section, makes the appointment, the same as if he had been specially authorized by the Act to do so.'

"Assuming then, that this Board was validly constituted, the relators were entitled, I think, to require from the Mayor and City Council the surrender of the use of the Fire Alarm, Police Telegraph, all the station houses, watch-boxes, arms and accoutrements, mentioned in the 12th section of the Act, and to exact a compliance with this demand by the writ of *mandamus*. The property, in question, was acquired by means of taxes imposed by the State, through the instrumentality of her municipal agent, and was strictly public property, and as such subject to the disposition and control of the State. It was not private property held for municipal uses as property acquired by endowment or gift, (2 *Kent*, 309.) This proposition is established by the case of the *Mayor & City Council vs. Lemmon*, and the cases of *Washington County vs. The Railroad Company*, 12 *G. & J.*, 438, and the same case in 3 *How.*, 550.

"In speaking of the money claimed by Washington county, the Court of Appeals say, that the county by which the claim is attempted to be enforced, is one of the public territorial divisions of the State, established for political purposes, connected with the administration of the government. In that character she would receive the money as public property, to be used for public purposes only, and not for the use of the citizens in their private individual characters and capacities. In that relation they would have no immediate interest, and could assert no title. And in 3 *How.*, 550, the Supreme Court say, in reference to the money claimed by Washington county: 'If this money had been received from the Railroad company, the Commissioners, in their corporate capacity, would not have been entitled to it, and could neither have received, nor disbursed it, nor directed the uses to which it should be applied, unless the State had seen fit to enlarge their powers and commit the money to their care. This cor-

396 . MARYLAND REPORTS.

Mayor, &c., of Balto. *vs.* State, *ex rel.* of the Board of Police of Balto.

poration, therefore, had certainly no private corporate interest in the money, and, indeed, the suit is not entered for their use, but for the use of the county. The claim for the county is equally untenable with that of the Commissioners.'

"But the true ground of contest with respect to this branch of the power exercised by the Legislature, is that which is raised by the answer, and supported with great ingenuity by the counsel for the respondents. It is this: By the 19th section of the 4th Article, the Mayor and City Council are empowered to provide for the creation and government of such temporary and additional police force, as they may deem necessary, for the preservation of the public peace; that this right being secured by the Constitution, is beyond the control of the Legislature; and that the whole police apparatus demanded by the relators in their petition for a *mandamus*, is necessary for the use and accommodation of this force. Admitting the foundation on which this argument is erected, to be sound, the conclusion is irresistible. But the defect in the argument is in the original proposition.

"The police force which was in existence at the time of the passage of this Act, and which is now in existence, and for the use and accommodation of whom this police apparatus has been provided, is not an additional and temporary police, but the police created and organized under the Act of Assembly of 1853, ch. 46, and the ordinance of the 1st of January 1857, passed in pursuance of that Act. This is apparent from the fact that while the police now existing, as organized under the Act of 1853, and the ordinance of 1857, is charged with the entire class of police duties, any additional and temporary police which the Mayor and City Council might create under the power granted by the 19th section, would be limited to the preservation of the public peace.

"If the Mayor and City Council were involved in a controversy in reference to their right to create the police force now in existence, and in a special plea of justification, derived their right to raise this force from the 19th section of the 4th Article, it is clear that the court would be obliged to pro-

nounce a plea of that description, defective.     It follows, therefore, that as the Act of 1853, ch. 46, under which the existing police, for whose use this police apparatus was prepared, is repealed, the police force must itself disappear at the period designated by the bill, and the police apparatus, which was provided for its accommodation, must be transferred for the purposes of that force which supplies its place.     It is only necessary, in concluding the opinion on this part of the case, to say that, as the question whether the existing police force was created under the 19th section of the 4th Article, or under the Act of 1853, ch. 46, is a question of law, the allegation in the answer in reference to this subject, is not conceded by the demurrer.

"The 15th section of the bill presents the question as to the authority of the Legislature to confer upon the Commissioners the means of raising the money necessary for the execution of the duties imposed upon them, without which, of course, the Board would be inefficient and powerless.     That portion of the 15th section which confers on the Commissioners the authority to estimate what sum of money will be necessary to enable them to discharge the duties imposed on them, and the obligation of the Mayor and City Council to raise, by assessment, and levy upon the assessable property of the city, the sum thus estimated by the Board, is not obnoxious to any valid objection, as a question of power.     But the Commissioners are authorized to issue certificates of indebtedness, in the name of the Mayor and City Council, in the manner, upon the terms, and for the purposes indicated by the bill, upon the contingency of the Mayor, Register, Comptroller, or other proper disbursing officer, failing to comply with the requisitions of the Board, and the validity of this power has been contested and defended with great ability by the respective counsel.

"The counsel for the respondents contend that these certificates are to be considered as bills of credit, and therefore within the prohibition of the 10th section of the 1st Article of the Constitution of the United States.     The argument assumes, and correctly assumes, that these certificates, though

issued by the Board, are to be treated as issued by the State; but it necessarily concedes the proposition, that when the taxing power, or any other power, is exerted by a municipal agent, the act is to be regarded as the act of the State, exercised through the instrumentality of its agent. The power emanates from the State, and the State can, of course, regulate the manner in which the power is to be used. The case of the *Mayor & City Council vs. The Balto. & Ohio Railroad Co.,* 6 *Gill,* 288, establishes the principle that the State may declare what the city may and may not tax. These certificates are clearly not bills of credit—the faith of the State is not pledged for their redemption, which is essential in the definition of a bill of credit. (*Craig. vs. State of Missouri,* 4 *Pet.,* 410. *Briscoe vs. The Bank of Kentucky,* 11 *Pet.,* 257.) The exercise of this power is not in conflict with the Constitution of the General Government; and I am not aware of any restriction upon the taxing power of the State, except such as is to be found in the Constitution of the United States, or in the 13th Article of our Bill of Rights. Any power which the State can exercise, directly, it may exert through the instrumentality of its municipal agents, and the authority to use the power, includes the right to determine the mode in which the power was to be employed; and if the Legislature chooses to select two agents, as has been done in this case, for the execution of her own authorized powers within the limits of her municipalities, it is difficult to perceive why she cannot authorize one of those agents to use the name and power of the other.

"The right to use this authority stands on the proposition that the whole taxing power of the municipality is at the command and under the control of the State. But even if the authority granted to the commissioners to issue these certificates, and use them in the way prescribed by the bill, could be considered as not within the competency of the Legislature, I do not think it would invalidate the Act. (7 *Md. Rep.,* 161. 2 *Gray,* 98 to 101.) It is a contingent power that may never occur. The probabilities are all against the happening of an event upon which alone this power would be called into

existence. If this Act should be declared to be unconstitutional, by the court of dernier resort, the authority of the board is terminated. And if its validity should be established, the presumption is that the city authorities would yield to the requisitions of an Act of the State, which would then be decided as the acknowledged law of the land. It follows from the views thus expressed, that I think the relators are entitled to the writ of *mandamus*, as claimed in their petition; and in stating my opinion in relation to the two objections that have been raised against the bill, as interfering with the power of the Governor over the militia, and as invading the rights and privileges of the Sheriff, I do so, as these questions have been elaborately argued, and because the counsel for the respondents seem to consider that the parts of the bill connected with those objections, cannot be severed from its main provisions; and if they are unauthorised, the whole bill is invalidated.

"By the 9th section of the 2nd Article of the Constitution, it is declared that the Governor shall be commander-in-chief of the land and naval forces of the State, and may call out the militia to repel invasions, suppress insurrections and enforce the execution of the laws, but shall not take the command in person without the consent of the Legislature, and the question is, whether the power to call out the militia for any of the purposes mentioned in this section of the Constitution, is to be considered as exclusively vested in the Governor? I think not. The proposition that this power is to be regarded as vested exclusively in the Governor, ascribes to those who framed the Constitution, and to the people who adopted it, a want of sagacity not to be attributed to them. Suppose a servile insurrection, in actual operation, or threatened, or a railroad riot so formidable as to require the aid of the military arm for its prevention or suppression, in a remote county of the State, and the Governor is at the seat of government, or at some distant place, is it to be supposed that the Legislature have no authority to provide for such an emergency, by vesting in some of the tribunals of the State, or in some of the local authorities, as its own municipal

agents, the power of meeting the emergency by calling forth the militia? If so, the counties and the city of Baltimore might be left in a most defenceless condition. The Constitution of 1776, empowered the Governor, by and with the advice and consent of the Council, to embody the militia, and when embodied, they were placed under his command. The Constitution of 1836, conferred the same power on the Governor, the Council having been abolished, and under those Constitutions, the power of calling out the militia, has been vested by the Legislature in the courts and local authorities, and that this was a legitimate exercise of legislative authority, has never been denied or questioned, (*Act of* 1823. *ch.* 188, *sec.* 70.)

"That this power, as well as all other powers, vested in this Board, will be discreetly exercised, we have those guarantees which exist in reference to the faithful performance of official duties by other political agents, and if a power was to be defeated on the ground that it might be abused by those to whom it was entrusted, the objection would be fatal to all power. The objection raised to that portion of the bill which vests in the Commissioners the right to require the services of the Sheriff, and directs him, upon their order, to summon the *posse comitatus*, and places the Sheriff and that force under the direction of the Board, cannot, I think, be maintained.

"The sheriff is a constitutional officer, but his duties as a conservator of the peace, are not defined by the Constitution. Those duties are common law duties, and are described by the Supreme Court in the case of *South vs. The State of Maryland*, in 18 *How.*, 402. It is there said that the sheriff, as a conservator of the peace of his county, or bailiwick, is the representative of the king or sovereign power of the State, for that purpose. He has the care of the courts, and though forbidden, by *Magna Charta*, to act as a justice of the peace on trial of criminal cases, he exercises all the authority of that office, where the public was concerned.

" He may, upon view, without writ or process, commit to prison all persons who break the peace, or attempt to break

it, and, for these purposes, he may command the *posse com-itatus* of the county.

"These are the common law duties of the sheriff, as a conservator of the peace, and as such may be repealed or modified by the Legislature at its will and pleasure. This is done every day. I do not perceive in what way the private rights, privileges or immunities of the Sheriff, are invaded by this Act; and his official duties are subject to the control of the Legislature. In the case of the *People vs. Draper*, 25 *Barb.*, in speaking of the sheriff, the court says: 'At common law, and at the time of the adoption of this Constitution, in most, if not all the counties, the sheriff was, in some sense, head of the police, and it was his special duty to preserve the peace. He is an officer who is recognised by the Constitution, and whose election is there specially provided for, yet that part of his duties could unquestionably be taken from him, and performed by others, as by the mayor of a city, or the head of police.'

"After a careful and anxious examination of this case, I have come to the conclusion that the objections raised against this Act, and which have been pressed with great ingenuity and ability are to be considered as applying only to the question of expediency, with which the court has no concern, and not to the question of power."

· Orders were thereupon passed sustaining the demurrer to the answer of the Mayor and City Council, and making absolute the order for the *mandamus* as prayed for by the relators, and dismissing the petition of the Mayor and City Council for the *mandamus* prayed for by them. From these orders these appeals were taken.

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and BARTOL, J.

The brief submitted by *Meredith, Price, Schley* and *Alexander*, as counsel for the appellants, and referred to in the opinion of this court, contains these *general propositions:*

1st. That the Act of 1860, ch. 7, (the Police Act,) in its

whole scope and design, and in each of its provisions hereinafter referred to, is repugnant to the letter and spirit of the Constitution, and is consequently void.

2nd. That the leading and governing intent of the framers of the Constitution, necessarily inferred from the whole structure of the instrument, was the decentralization of power by distributing it among the local authorities of the State, and by making all local officers elective mediately or immediately by the electors of the locality; in other words, popularizing the whole frame of government, and that, therefore, all legislative power tending to oppose or thwart this manifested intent of the Constitution, that is to say, to depopularize and centralize the powers of government, is, by necessary implications, prohibited.

3rd. That the Constitution contains a general grant of legislative power, subject, however, to express or implied prohibitions.

4th. That limitation upon the legislative power rests not merely upon the Constitution, but upon the great and immutable principles of right and justice which lie at the foundation of all free governments, and that, therefore, all such provisions in the bill as violate those principles, are as absolutely void as if expressly prohibited by the Constitution. 3 *Dallas*, 387, *Calder & wife vs. Bull & wife.* 10 *Barb.*, 223, *Benson, et al., vs. Mayor, &c., of New York.* 9 *G. & J.*, 408, *Regent's Case.* 2 *Md. Rep.*, 442, *Wright vs. Wright.*

This brief also submits the following *points:*

1st. The appellants will contend that the Constitution does not confer upon the Legislature the power of *appointment* of the Commissioners as exercised by the 4th sec. of the Act. 1st. Because the appointment to office is peculiarly an executive, not a legislative power, and the two powers are, by the Bill of Rights, (Art. 6,) declared to be forever separate and distinct from each other. 2nd. Because sec. 11 of Art. 2 of the Constitution, gives to the Legislature, in creating an office, power only to *prescribe the mode of appointment*, and can, by no legitimate mode of construction, be interpreted to grant the power of legislative appointment. 3rd. That by the said

section, the Governor has the power "to fill all offices in the State, whether created by the Constitution or by Act of Assembly, unless otherwise provided by one or the other." If the law creating an office does not prescribe the mode of appointment, the Governor has the same power to appoint that he would have were he specially authorized by the Act to do so; and that, in this case, if the appointment by the Legislature is not warranted by said sec. 11 of Art. 2, and the Act is, in other respects, constitutional, the power of appointment devolves upon the Governor. 4th. That the Legislature, under the authority of said section, had, in this case, power to delegate, and ought to have delegated the appointment of Commissioners to the people, or to the local authorities of the city of Baltimore. 5th. That the Legislature had no power to authorize the Commissioners to fill vacancies in the Board of Police, as provided for in the 3rd sec. of this law.

2nd. The 14th sec. of the Act tranfers the whole existing police force of the city of Baltimore—officers and men—from the city government to the Commissioners. The appellants will insist that this section is unconstitutional and illegal, 1st. Because the charter of 1796, in giving to Baltimore a local government, gave, by unavoidable implication, all the means necessary for the purposes of government, among which was a police power to maintain the peace and security of the governed. It is an *inherent right,* co-existent with the government, and cannot be separated from it. *Federalist, Nos.* 33, 44. 1 *Story's Comm. on Cons., secs.* 433, 434. 2nd. Because if not an inherent right, but a *franchise,* the corporation cannot be divested of it by a legislative Act, but only by "the law of the land," (*Dec. of Rights, Art.* 21,) and that law prescribes an adequate and the only remedy by *scire facias,* which is applicable to the forfeiture of a charter *in whole or in part. Wilcock on Municipal Corporations,* in 14 *Law Lib.,* 183. The forfeiture of a charter, or of any one or more of its franchises, is within the judicial, but not within the legislative power. 3rd. Because the Constitution, in recognizing the municipal corporation of Baltimore as part and parcel of the organized government of the State, has placed its charter be-

404      MARYLAND REPORTS.

Mayor, &c., of Balto , vs. State, ex rel. of the Board of Police of Balto.

yond the reach of mere legislative power. 4th. Because, if the Legislature has no power to repeal the charter of 1796, it has no power to dismember the government created by it, by annulling and destroying important and indispensable franchises. 5th. Because the existing police force of the city of Baltimore, which this 14th sec. of the Act transfers to the Commissioners, was created, and has been, and is governed, by the Mayor and City Council of Baltimore, in virtue of the power granted to them by the Constitution.

3rd. The 12th sec. of the Bill transfers to the Commissioners the use of the Fire Alarm and Police Telegraph, and all station-houses, watch-boxes, arms, accoutrements and other accommodations and things provided by the Mayor and City Council, as fully and to the same extent as they are now or may be used by the said city police, and, in case of refusal, provides for the issuing of a *mandamus*. The appellants will contend that a legislative Act which takes away the *vested rights* of property for any purpose except where it is taken for public use, and upon a just compensation, is beyond the scope of legislative authority. 4 *Wheat.*, 694. That the property enumerated in this 12th sec. was purchased and paid for by the corporation for the use of its present police, and was vested in the corporation by the Act of 1827, ch. 167, by force of which it became its private property, subject to its own disposal, and of which the Legislature cannot deprive it against its will and consent. That although it is true this section does not, in terms, deprive the corporation of *ownership* of this property, it effectually does so by depriving the city of its *use*. That to take from the owner the *use* of his property, is an act of confiscation not within the scope of legislative power. 5 *Md. Rep.*, 322, *Moale vs. Mayor & C. C. of Balto*. And that if the Legislature cannot take away the use of property, it cannot *regulate* such use. 9 *Gill*, 309, *Baugher vs. Nelson*. 2 *Kent*, 329, 340.

4th. That the permanent police created and established by the Act is a violation of sec. 19, Art. 4 of the Constitution. That this section was intended to carry into effect the power which the 2nd Art. of the Bill of Rights declares, *is solely*

DECEMBER TERM, 1859.            405

Mayor, &c , of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

*and exclusively the right of the people*, by laying the basis of a permanent police for the whole State, and authorizing the Legislature to perfect it.

5th. That sec. 19 of Art. 4 of the Constitution gives to the Mayor and City Council power to provide by ordinance, from time to time, for the creation and government of such temporary and additional police as they may deem necessary to preserve the public peace. That the term, "additional police," refers for its co-relative to the permanent police provided for the city by the antecedent clauses of the section, and that the word "temporary," was meant to give to the Mayor and Council, *from time to time*, power to change and modify the police system for the time being; in other words, to contradistinguish such police from the permanent police created by the section for the several counties of the State and city, so that every police ordinance passed, creates by the Constitution a temporary police force liable to be altered by ordinance as the wants and exigencies of the city may require.

6th. That the power conferred upon the Mayor and City Council by sec. 19 of Art. 4 of the Constitution, to create and govern by ordinance such additional temporary police as they may deem necessary to preserve the public peace, is an exclusive power; and that a concurrent legislative power would be wholly contradictory and repugnant to the power so expressly granted to the city. 4 *Wheat.*, 193, 426. 1 *Story's Comm. on Cons.*, sec. 447.

7th. The 15th sec. of the Act creates a debt against the city without its consent, and against its will, and is against right and justice, contrary to the principles of a free government, and wholly unauthorized by any power granted to the Legislature by the Constitution. 16 *Mass.*, 84, *Hampshire vs. Franklin.*

8th. The power given to the Commissioners by the same section, to issue certificates of indebtedness, bearing interest, in the name of the Mayor and Council, with power to pledge or dispose of them, and thus to put them into circulation, and making them a tender in the payment of taxes, at par, is a

violation of sec. 10, Art. 1, of the Constitution of the United States, and, therefore, void.

9th. The 13th sec. of the Act transfers to the Commissioners, at their will, one of the chief functions of the office of sheriff, as conservator of the peace, and deprives him of all discretionary power to raise, use and direct, a *posse comitatus* for its preservation; thus unwarrantably transferring to the Commissioners, *appointed by the Legislature,* one of the principal duties of a constitutional officer, *elected by the people.* 2 *Denio,* 272, *Warner vs. The People.* 25 *Barb.,* 378, 379, *People vs. Draper,* and same case in 1 *Smith,* 551, 552. 4 *Md. Rep.,* 189, *Thomas vs. Owens.*

10th. The 16th sec. of this Act imposes a penalty of $1000, and a disqualification forever, from holding or exercising any office or employment whatsoever under the Mayor and City Council, or under the Commissioners, upon each and every person who shall, among other things mentioned therein, hinder or obstruct the organization of the Board of Police, or maintain or control any other police force than that established by the bill. It will be contended that this amounts to a disfranchisement, which the Legislature has no constitutional power to inflict. *Cons., Art.* 1, *secs.* 2, 5; *Art.* 3, *sec.* 33.

11th. The 6th sec. provides "that no Black Republican, or endorser or supporter of the Helper Book, shall be appointed to any office under said Board," and thereby introduces into legislation the principle of proscription for the sake of political opinion, which is directly opposed to the cardinal principles on which the Constitution is founded.

12th. The 13th sec. of the Act gives to the Commissioners the power, in their discretion, to call out the military force of the city, and makes it the duty of such military force so called out, to obey such directions as may be given by the Commissioners in derogation of the constitutional power of the Governor, and without any power, express or implied, granted to the Legislature by the Constitution. *Cons., Art.* 2, *sec.* 9; *Art.* 9, *sec.* 1.

13th. The 19th section of the Act interjects the Commissioners into the city government as *authorities;* in other words

as agents of the corporation, against its will and consent; and makes the corporation subordinate to and controllable by the Commissioners, and yet responsible, while it is so controlled, for any failure of the Commissioners to discharge their duties and obligation—against every principle of right and justice, and in total abrogation of the settled and well known laws of agency.

14th. The appellants will further contend that, as a rule of statutory construction, when the different parts of an Act are so connected together as to form a connected and entire whole, if any one of its main provisions shall be judicially declared void, it will render the whole Act void; and they will insist upon the applicability of this rule to the present case. 2 *Gray.,* 84., *Warren et al., vs. Mayor & Aldermen of Charleston.* 7 *Md. Rep.,* 160, *Davis vs. The State.* 1 *Louisiana Ann. Rep.,* 116, *The Second Municipality of New Orleans vs. Morgan.* 3 *Ohio State Rep.,* 34, *Exchange Bank of Columbus vs. Hines.*

*Thos. S. Alexander* for the appellants:

The legislative power, in the absence of constitutional limitations, extends to all appropriate subjects of legislation; the limitation is the exception, and he who would insist upon the limitation must prove it. But it is not at all necessary that the limitation should be created by express words. It may be made out by implication, resulting from the grant of power to another department, and even by the form in which power is granted to the Legislature.

In this respect, we admit, there is a wide distinction between the Congress of the United States and the Legislature of a State. Congress possesses no power which has not been delegated to it expressly or by plain implication. And this rule, which might otherwise be rested on general principles, is enforced by Amendment 10 to the Constitution of the United States: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." But it is nevertheless settled, that the powers which are

408          MARYLAND REPORTS.

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

granted to Congress may be exercised in such manner as are best calculated to promote the objects of the grant. Thus the power expressly granted to regulate *commerce*, carries with it the power to regulate *ships* in which commerce is carried on. 9 *Wheat.*, 1, *Gibbons vs. Ogden.* And the power to provide for calling out the militia "to repel invasion, to suppress insurrection, and to enforce the execution of the laws," authorises Congress to provide for calling out the militia in anticipation of such dangers. 12 *Wheat.* 29 *Martin vs. Mott.* In *M'Culloch vs. The State of Maryland*, 4 *Wheat.*, 316, it was adjudged that though Congress cannot charter a bank as a mean of promoting the general commerce of the country, it has power to charter a bank to aid the treasury in the collection and disbursement of the public revenue. The power expressly delegated by *Art.* 1, *sec.* 8, *pl.* 18, to make all laws which shall be *necessary* and proper for carrying into execution the powers expressly granted, confers on Congress a choice of means, and does not confine it to what is indispensably necessary. 2 *Cranch*, 358, *United States vs. Fisher.*

We are content, then, to run the parallel between Congress and the local legislature of Baltimore, each being a legislative body of specially delegated authority, and we contend that the powers granted to the Mayor and City Council of Baltimore, are to be exercised in such manner as will reasonably advance the objects of their creation.

1. By sec. 19, of Art. 4, of the Constitution, justices of the peace and constables are to be elected in the several election districts of the counties and wards of the city of Baltimore, in such numbers "as the wants and interests of the people may require," and they are declared to be, by virtue of their offices, conservators of the peace, in their respective counties and city. By the last clause of the same section, "The Mayor and City Council of Baltimore may provide by ordinance, from time to time, for the creation and government of such temporary additional police as they may deem necessary to preserve the public peace." The police to be created by the Mayor and City Council is to be *additional*,

and the inquiry is to what? The next antecedent is the force of justices and constables. They constitute unquestionably a *police;* and the Mayor and City Council are authorised to create an additional *police.* The justices and constables are declared to be a police for conservation of the *public peace;* and the Mayor and City Council are to create an additional police to preserve the *public peace.* In arithmetical language, the police of justices and constables, established by the Constitution, and the additional police to be created by the Mayor and City Council, are of the same denomination. They are capable of addition and of forming one homogeneous aggregate. To *add* is "to set or put together; join or unite." "In general, when used of things, it implies a principal thing to which a smaller is to be annexed, as a part of a whole sum, mass or number." The whole section is suggestive, therefore, of the idea, that the justices and constables were designed to form (as in all past time they have formed) a complete and sufficient police for the rural districts of the State; and that in view of the peculiar circumstances of the city of Baltimore, its local legislature was empowered to provide such temporary additional police, as, with the force of justices and constables, would be equal to the preservation of the peace of the city. The strength of the force to be created by the Mayor and City Council, is to be determined by the strength of the justices and constables to which it is to be added. The forces combined are to be sufficient, and no more than sufficient to preserve the peace of the city. Hence there is no room for implication of a power in the Legislature, or elsewhere, to interpose a third police force between the justices and constables, and the additional force to be provided by the city. Such third force would be simply unnecessary. It could not be introduced without interfering materially with the exercise of the power expressly conceded to the city, which, as we have seen, is a power to create such an additional police as, with the justices and constables, will be necessary to maintain the peace of the city.

It is conceded by the counsel on the other side, and by the judge who decided the case in the court below, that the Com-

stitution recognises the existence of a permanent principal police, to which the police, which the city is authorised to create, is to be *additional*. They insist that at the time of the adoption of the Constitution there was a police of the city, organized under the provisions of the Acts of 1812, ch. 194, and 1817, ch. 148, which, in this respect, are supplementary to the original charter; and that the additional force to be created under the Constitution is to be attached to this charter police. Upon this hypothesis the conclusion seems to be inevitable, that the Acts of Assembly referred to have become incorporated into the Constitution, and that the police organized under them is become a constitutional police. Such would, undoubtedly, have been the consequence if the Constitution had, in words, provided that the Mayor and City Council should have power to create and govern "such temporary additional police, as they may deem necessary, *in association with the police already created by the Acts of* 1812 *and* 1817, to preserve the public peace." We hold it to be clear, that the consequences resulting from the implication when made, must be precisely the same, whatever may be the language used out of which the implication itself arises. The power to create and govern an additional police is as enduring as the Constitution itself. And so long as this power to add endures, the principal thing to which the addition is to be made, must continue to exist. Hence, by plain and necessary, violent and inevitable implication, the force created under the charter and its supplements, if that force is taken to be the principal force intended by the Constitution, must be endowed with the permanence of a constitutional sanction.

The difference between the counsel on the other side and ourselves is more of form than reality, and is susceptible of easy explanation and reconcilement. At the time of adopting the Constitution the peace of the city was in the joint keeping of a police of justices and constables, and of a charter police. But the charter police was limited in number. It was already inadequate to its object, and the rapid growth of the city was rendering its inefficiency daily more apparent.

DECEMBER TERM, 1859.        411

Mayor, &c., of Balto. vs. State, ex rel. of the Board of Police of Balto.

The framers of the Constitution intended to remove this stint on the power of the city and to enlarge its authority, so that it should be adequate to the maintenance of the public peace in any and every emergency.    But, as in time past so in time to come, the object was to be effected by the work and power of the police of justices and constables, and of the municipal police.

In addition to their duties as conservators of the peace, the justices and constables "shall have such duties and compensation as now exist, or may be provided for by law."   Hence it is argued that the only object of the section "was to organize subordinate judges with a limited jurisdiction, and to provide them, in the constables, with executive officers who bear the same relation to the justices that the sheriffs bear to the courts; and therefore the section is found in that Article of the Constitution, which provides for the organization of the judiciary department; and that the declaration that they shall be conservators of the peace is an act of supererogation and was inserted from abundant caution; for both justices and constables would be, *ex officio*, conservators of the peace in the absence of any provision of the kind in the Constitution."    According to this argument, the only power which is *indissolubly* annexed to the offices of justice and constable was conferred unnecessarily, and out of abundant caution! and these powers, for the exercise of which it was supposed the offices were established by the Constitution, may be withdrawn by the Legislature!!!    It is certain that the authority of the justices and constables, as conservators of the peace, is beyond all legislative control.    And it would seem to be equally certain that the Legislature may add to the duties of the justices and constables, and may modify and withdraw any of the powers which they now exercise, saving and excepting their powers as conservators of the peace. Their jurisdiction in cases of small debts may be extended to $200.    In the counties it may be confined within its ancient limit of £10.    They have criminal or police jurisdiction under the oyster laws and negro laws.   May not the Legislature divest them of all these powers?    Either all the powers vested

in justices and constables (save only their powers as conservators of the peace) are subject to legislative direction, or all the laws in relation to their duties existing at the time of the adoption of the Constitution are become part and parcel of the Constitution itself. Are learned counsel prepared to adopt the latter form of the dilemma? It is quite a mistake to assume that the provision affirming their power as conservators of the peace was an act of supererogation. It is only because such power was to be secured beyond the reach of legislative encroachment, that the Constitution declares they shall be conservators of the peace, and it is just because it was deemed unimportant that their other criminal and civil jurisdictions should be continued to them, that their other powers are left subject to legislative control. It is conceded that whilst justices and constables have jurisdiction in cases of small debts, they are to be treated as parts of the judicial power. Divest them of all power, saving their powers as conservators of the peace, would they not remain ministers of justice? As conservator of the peace, it is the office of the constable to prevent crime, to arrest offenders, to bring them to justice. He may arrest on view, in some cases, without warrant. But he acts ordinarily under judicial process. The justice acts judicially when he issues a warrant, when he conducts an examination, when he commits, discharges, or admits to bail. If, therefore, the Constitution had designed to limit the authority of justices and constables to their original common law jurisdictions, the section in relation to these officers would be found in its present position. They would be part and parcel of the judicial department.

Let us next consider what is the character of the police force, which the Mayor and City Council are authorized to create. It is to be a police for the preservation of the public peace, and, therefore, to be endowed with faculties commensurate with its avowed object. But a police force which is to be created by sudden and casual emergency, and is to be dissolved on the subsidence of that emergency, would be utterly unavailing. In what respect would an additional police, thus hastily called together, take precedence of the sheriff's *posse?* It would be nothing more than a legalized rabble, hardly as

well disciplined as the mob to which it was opposed. If it is conceded (as is conceded by every provision in this Police Act) that in a populous city it is indispensable that the police shall be trained and disciplined, prompt for action and submissive to command, we must not impute to the Convention the inconsistency of charging the Mayor and City Council with the duty of maintaining the public peace, and, at the same time, of requiring that their police power shall be exercised under circumstances which must be fatal to its efficiency. In the absence of express words, or plain and necessary implication, we cannot presume that any limitation on the power which would so completely embarrass its exercise, was intended. The only expression in the clause from which a limitation is to be inferred, is the word *"temporary."* But *temporary* is relative to *permanent.* The police of justices and constables is permanent, because it is designed to be as lasting as the Constitution. And the police to be created by the Mayor and City Council, is declared to be a temporary police, because it is liable to be changed, from time to time, as the exigencies of the city may require. The provision is to be made for the *creation* and *government* of a police. The *creation* of a police may be effected by the enrollment of its members. The *government* of a police, after its creation, involves its organization, its discipline and its employment, in its destined service. The police is, therefore, to be kept on foot for some time after its creation. But for what space or term of time? So long as the necessity which induced its creation shall continue. And of the continuance of this necessity, as of its original existence, the Mayor and City Council are the exclusive judges. It is made their duty at all times to keep on foot a disciplined police, adapted to the necessity of the occasion. The police is to be created and governed by ordinances to be passed from time to time. In other words, an ordinance is to be passed for the creation of a police, which, when created, is to be continued and governed according to the provisions of that ordinance, until the Mayor and City Council shall deem it expedient to pass another ordinance repealing or modifying the first, and disbanding or re-organizing the police

thereby originated.   Whence, then, the necessity of inferring or presuming an intent on the part of the framers of the Constitution, to reserve to the Legislature any power to provide for the public peace?   It can only be induced by a neglect of the duty of the Legislature to provide for the election of justices and constables in numbers adequate to the wants and interests of the people, or by an encroachment on the authority delegated to the Mayor and City Council.   If the Legislature can create a police in the city of Baltimore, a like police may be established in every county in the State.   A central police may be established at Annapolis.

If these views are well founded, there can be no difficulty in pronouncing the Police Act to be unconstitutional.   The Board of Police thereby created, are empowered to assume control over the justices and constables, and the police of the city.   They are to assume the exclusive control and guardianship of the peace of the city, and all conservators of the peace in the city are to act under their orders, *and not* otherwise.   The power expressly delegated to the Mayor and City Council by the Constitution, is, in words, respected, but is, in effect, nullified.   For the temporary police, created by the city, would immediately pass under the government of the Board.

2. The property which is claimed by the relators is needed by the city for the use of its existing police.   If that police has been organized in a constitutional manner, and the property in question is needed for its purposes, it would seem to be too clear for disputation, that it cannot be deprived of that property by any power which is not able, at pleasure, to disband that police.   The power to create and to maintain, implies the power to endow the police force thus created and sustained, with every faculty which is needed to ensure its efficiency. To establish, then, the right of the relators to the station-houses and other like properties, even on their hypotheses, it must be shown that the city has no power to create a police which can need the use of such properties.   It will not be sufficient to show that the present police is not organized in strict conformity with the requirements of the Constitution.

If, as is contended, the Constitution designed the creation of a police whose duties should be confined exclusively to the preservation of the public peace, then the ordinance which professes to confer on it other police duties, is simply void, or is void as to the excess. In the last alternative, the police will be actually a peace police and nothing more, and in the former, the Mayor and City Council may yet exercise their power to create a peace police. In either aspect, the question of property resolves itself into this: Have the Mayor and City Council the power to create and govern a police which can require the use of the properties demanded?

We are willing to concede that in the absence of all constitutional limitations, the Legislature would have power to repeal or to modify the charter of the city of Baltimore, and to regulate the use of the city property. But the corporate existence of Baltimore is recognized by the Constitution. The Mayor and City Council are recognized as the repositories of corporate power. Hence the Legislature cannot revoke the charter. But the Mayor and City Council have the power, by ordinance, to create offices, and to provide for election or appointment thereto. In express terms, they have the power to create and govern a police for preserving the peace of the city. The powers to tax and acquire property, and to regulate the use of the city property, are necessary incidents. If these incidental powers are denied, the exercise of the powers delegated will become impracticable. Deprive the city of the power to subsist a police, and you disorganize the body. Take from the city its station-houses and like properties, and you render the police inefficient.

In *Hoye vs. Swan*, 5 *Md. Rep.*, 237, it was declared that the Legislature cannot take away the property of A and transfer it to B. There can be no difference in this respect between a natural person, or a collection of natural persons, and a private corporation. Does the Legislature possess greater power over the property vested in a municipal corporation? As a general proposition, it may be conceded that the Legislature may withdraw, at pleasure, a political franchise granted to a public corporation. But what is a franchise? It may

be defined to be a branch 'of sovereign authority vested in 'one or more persons, to be exercised by him, or them, for some public end. It is a capacity of action. It is a power to be exercised. Its exercise may result in the acquisition of property; but property thus acquired is no part 'of the franchise. A repeal or revocation of a franchise, takes away the right of using the powers for the future. But it cannot defeat a title to property acquired in the past exercise of the franchise. An act of incorporation for banking purposes, creates a franchise. No one would say that the right to repeal the charter involves· in it the right to appropriate to public uses the original capital, with its accumulated profits. We would be surprised, at the least, by the assertion, that after the completion of our water-works, the Legislature may confiscate them to a public use, and require the profits thereof to be paid into the State Treasury for State purposes, or that our interests as a stockholder in the Baltimore and Ohio Railroad Company may be appropriated, at the pleasure of the Legislature, to the support of public schools in the several counties.

In England, where the authority of Parliament over the franchises of a municipal corporation is supposed to be unlimited, it was denied, on a memorable occasion, that this power could be exercised in derogation of the rights of property. 4 *Wheat.*, 559. And *Chief Justice Buchanan*, in 9 *G. & J.*, 409, *The Regent's Case*, quotes, with approval, Lord Thurlow's declaration, that the effort made on the part of Fox to remodel the charter of the East India Company, which was undoubtedly a public corporation, "was an atrocious violation of public property, which cut every Englishman to the bone." The case of *Terrett vs. Taylor*, 9 *Cranch*, 43, (which will be relied on by the other side,) was a case of a private corporation. It is said by the court: "In respect, also, to public corporations which exist only for public purposes, such as counties, towns, cities, &c., the Legislature may, *under proper restrictions*, have authority to change, modify, enlarge or restrain them, *reserving, however, the property for the uses of those for whom and at whose expense it was originally purchased.*" Now here we see that the

Legislative power over the franchises of a public corporation is not altogether without limit, and that, in respect to property acquired in the exercise of a franchise, there is a duty resting on the Legislature to secure it to those at whose expense it was purchased. The case of *The State vs. The Balto. & Ohio R. R. Co.*, 12 *G. & J.*, 400, and 3 *How.*, 535, is a clear authority in favor of the proposition that the Legislature cannot discharge an individual from the obligation of a contract made by him with a county, and by necessary intendment, that it cannot seize upon the property of a county or city purchased by the contributions of its citizens, or with money borrowed on their credit.

Art. 13 of the Declaration of Rights, declares that "every other person in the State, or person holding property therein, ought to contribute his proportion of public taxes for the support of government, according to his actual worth in real and personal property." Now, this Article, in terms, prescribes a rule for individual contributions. But it is a clear deduction from 1 *Gill*, 302, *Waters vs. State*, that the aggregate of individuals constituting a local division of the State, are entitled to the benefit of the same rule of equality. But if the State cannot, by the direct exercise of the taxing power, discriminate to the prejudice of Baltimore, on what principle can it seize upon its property, purchased with the avails of taxation, and the loss of which is to be remedied by a second exercise of the taxing power by her local authorities?

This power of seizure and confiscation is equally negatived by the Constitution, Art. 3, secs. 46 and 42, and the relators must fail in their present suit, unless it can be shown that they are officers of the city, and are in such capacity to use the property which they demand. Are they officers of the city? They were appointed by the Legislature, and on the Legislature depend for their continuance in office. Their duties are prescribed by the Legislature, and to that body they are accountable for the discharge of those duties. In no sense, whatever, are they municipal officers. They are not made such by the usurpation of our property, under color of appropriating it to our use. The law of property recognizes the

right of the owner to dispose of it as his discretion may dictate, and every unnecessary restraint on that right is against natural justice.

This question of property was discussed at large in the New York .case of *The People vs. Draper*, 25 *Barb.*, 344, and 1 *Smith*, 532. But as it arose in a *quo warranto*, the question was treated by the Court of Appeals as a subordinate question, and as not properly for consideration. In the Supreme Court, one of the two judges constituting the majority, thought the question was unnecessary. Not one of the judges ventured to affirm expressly and precisely that the Legislature had the power to wrest from the city of New York any part of her property for the uses of the Metropolitan police, or that the Commissioners, because they were to exercise their functions within the city, were, therefore, to be treated as local officers. On the contrary, the constitutionality of that organization was defended on the ground that they were not municipal officers.

3. The appointment of the Commissioners by the Legislature is contrary to Art. 2, sec. 11, of the Constitution, which provides that the Governor "shall nominate, and by and with the advice and consent of the Senate, appoint, all civil and military officers of the State, whose appointment or election is not otherwise herein provided for, unless a different mode of appointment be prescribed by the law creating the office." Under this section, the Legislature might have conferred the power of appointment on the executive, or on the people, or on the local authorities. But it could not take to itself the appointment. This distinction between the power to prescribe the mode or manner of appointment and the power of making the appointment, is clearly stated in 7 *Ohio*, (*N. S.*,) 560, 566, 567, and it is there shown that whilst the one power is legislative the other is executive. The appointment to a ministerial office is plainly the exercise of executive power, (3 *J. J. Marshall*, 401,) and, as such, its exercise by the Legislature is condemned by Art. 6 of the Declaration of Rights. Instances are to be found of the exercise of a like power by Legislatures in former times. But those precedents have

never received judicial sanction.   And there is a marked difference between the Article as it stood in the old and as it stands in the present Constitution.    The Constitution of 1776 affirms the abstract proposition, "that the legislative, executive and judicial powers of government ought to be forever separate and distinct from each other."    It is in the new Constitution added: "And no person exercising the functions of one of said departments shall assume or discharge the duties of any other."    The addition, it is submitted, was made for the purpose of avoiding the pernicious influence of the older precedents.    If the Legislature is permitted to fill offices of its own creation, there is danger that it will legislate with a view to the extension of its own patronage.   Upon the principle of *The People vs. Draper*, it may combine two or more local divisions, and thus create a necessity for new classes of officers.    Upon the principle of the Police Act, it may supersede a constitutional officer, by the creation of another, with powers somewhat greater, or somewhat less, than is possessed by the officer to be superseded.    It may and will draw to itself the appointment to all offices created by law, and even within the gift of the executive, by the repeal of the law and the enactment thereof, with verbal changes.   It remains with this court to determine whether the Legislature does possess this power of encroachment on the executive department.    The question is not settled—nay is not touched—by the case of *Davis vs. The State*, 7 *Md. Rep.*, 151.

4. By sec. 16, of the Police Act, it is provided, that any one who shall forcibly resist or obstruct the execution or enforcement of *any* of the provisions of the bill, or disburse moneys in violation thereof, or hinder or obstruct the organization of the Board of Police by violence, or *otherwise*, or maintain or control, or *attempt* to maintain or control the present police force of the city, shall *forever* thereafter be disqualified for holding or exercising *any* office or employment whatever under the Mayor and City Council of Baltimore, or under that Act.    Now, this provision not only disregards the great principle of equality which pervades the Constitution and secures the eligibility of every one to all offices, but

directly contradicts Art. 3, sec. 33, of the Constitution, which gives to the Legislature the power to exclude from the privilege of holding any civil or military office in this State, any person who may be "convicted of perjury, bribery or other felony, unless such person shall have been pardoned by the executive." Here we observe, 1st, the disqualification is to be the consequence of *conviction;* 2nd, the offence must be *felony;* 3rd, the executive may *remove* the disqualification. Under the Police Act any act which the Board may be pleased to consider as an hindrance, or obstruction, to the organization of the Board, or its police, is declared to be the *unpardonable* sin which places the offender beyond the hope of forgiveness.

But it is further provided by sec 6, "that no Black Republican, or endorser or supporter of the Helper Book, shall be appointed to any office under said Board."

Excluding the consideration of the support or endorsement of the Helper Book, which may be a tangible act, the prohibition of the Black Republican introduces into our legislation the broad principle of *proscription for the sake of political opinion.* For the Black Republican is one who entertains certain, or, to speak more accurately, uncertain opinions, on the subject of the relations which exist, or ought to exist, between the white and negro races. The law does not define the boundary between right opinion and error on the subject, nor is an overt act necessary to constitute the offence. The appointing power is left to define for itself what constitutes Black Republicanism in doctrine, and to determine for itself what shall be sufficient evidence that the obnoxious sentiment is entertained by the object of its proscription. That proscription is intended, is apparent from the letter of the Act, and the intolerance which inspires political warfare in these days must assure us that the power will be most liberally exercised.

Now, if there is any principle of moral justice which commands the assent of all who appreciate the blessings of social liberty, it is that, for opinions entertained but not expressed, no man shall be called into judgment. But we claim,

further, as the invaluable birthright of every freeman, that he may express at pleasure his opinions upon all subjects of public policy, restrained only by positive enactment to the contrary. And to render such restraints consistent with liberty, they must arise out of some necessity associated with the morals, peace, order or well being of society; and moreover, they must be expressed in terms which clearly define the defence, so that the citizen, if impeached for a violation of the law, may take the judgment of the court upon his guilt or innocence.

Our objection is aggravated therefore, not lessened by the clouded definition of the offence. If a Legislature in former days had proscribed the Roman Catholic or the naturalized citizen, it is presumed this court would have no difficulty in pronouncing against the constitutionality of the provision. In principle the proscription is the same. In degree the difference is, that whilst the test of religion or of birth is susceptible of evidence, the test created by the Police Bill rests in the pleasure of the Police Board. What is Black Republicanism? A Black Republican may be defined to be one who thinks the area of slavery ought not to be enlarged. Again, he may be defined to be one who thinks Congress has power to legislate over the subject of slavery in the territories; and it is quite possible that, in the estimation of the Board, he is to be placed in the same category who concedes to the territorial Legislature any power over the subject. It is certain that in the letter of the proscription there is an elasticity which will, with willing minds, justify its expansion over two-thirds of the population of Baltimore.

If then these disqualifying clauses are operative parts of the Act, the whole Act must be pronounced unconstitutional. For the legal consequence must be the same, whether the law contemplates an unconstitutional object or a lawful object by the instrumentality of agents unconstitutionally selected. It is, therefore, argued on the other side, that those objectionable clauses are to be disregarded as inconsistent with the oath of office to be taken by the Commissioners, as prescribed by the 3rd sec. of the Act. Now, we are instructed by Chief Jus-

tice Marshall in *Pennington vs. Coxe*, 2 *Cranch*, 52, "that a law is the best expositor of itself—that every part is to be taken into view for the purpose of discovering the mind of the Legislature, and that the details of one part may contain regulations restricting the extent of general expressions used in another part of the same Act, are among those plain rules laid down by common sense, for the exposition of statutes which have been uniformly acknowledged." Lord Coke had previously said, (*Coke, Litt.*, 381:) "It is the most natural and genuine exposition of a statute, to construe one part of the statute by another part of the same statute; for that best expresseth the meaning of the makers." The construction is to be such that, if possible, no clause, sentence, or word, shall be superfluous, void or insignificant. Let us apply these principles to the clauses of the Police Act. The 3rd sec. directs the Commissioners to take an oath that they will in no case appoint any policeman, for or on account of the political opinions of such policeman, or for any other cause than the *fitness* of such person. Sec. 16, which disqualifies any person from holding office who shall have resisted the execution of the law, virtually declares that such person is *unfit* for the office of policeman. And sec. 6, which provides that no Black Republican, or endorser or supporter of the Helper Book, shall be appointed to any office under the said Board, virtually declares that the opinions entertained by such person, render *him unfit* to be appointed to office. There is then no incongruity between these several sections.

The present position of these several clauses can have no influence on construction. Let us then change their collocation; and let us see what effect is produced on the argument. Let the clauses in secs. 16 and 6, above referred to, be introduced immediately after the clause in sec. 3, prescribing the oath. Let them form parcel of the oath itself. The Commissioner will then swear, "that in no case *will I appoint* any policeman for or on account of his political opinions or for any other cause than the fitness of such person, but I will deem *unfit* for office any person who shall have resisted the

execution of the law, and I *will not appoint* any Black Republican or endorser or supporter of the Helper book."
Thus, the court will perceive, that by bringing these several clauses into juxta-position, all pretext for the objection of inconsistency is removed. As parts of one oath they stand in faultless harmony. The oath, as it stands in the Act, obliges the Board in no case to *appoint* for opinion's sake. But it does not provide that he may not be *rejected* because of his political opinions. On the other hand, the Helper clause does no more than oblige them to *exclude* from office all Black Republicans. The proviso does not say who *shall be* appointed. It contents itself with declaring who *shall not be* appointed.

5. Assuming then, that the Legislature intended to exclude from office all those who are, in the estimation of the Board, brought within the scope of the disqualifying clauses referred to, we are to inquire whether they may be disregarded, or whether their presence vitiates the entire law? And this question resolves itself into another, to wit: whether these objectionable clauses are so independent of the other provisions of the Act that they may be expunged or disregarded, without affecting the vitality of the residue of the Act? or, whether these several clauses of the Act are not so dependent, as conditions, considerations or compensations, the one for the other, as to constitute one inseparable whole? 2 *Gray*, 99. 1 *Louisiana Ann. Rep.*, 116. Now the objectionable clauses define the qualifications of the agents to whom the Legislature intended to confide the execution of the law. They were to possess certain moral qualities, and political affinities, in the absence of which it is implicitly declared there would not be an adequate guarantee for the exercise of the very delicate functions with which the officers of police were to be entrusted. You cannot sever one part of the qualification from another part of the qualification. You cannot select, as the ministers of the law, a different class from that which is defined by the law itself. Apply the argument to the case of the Commissioners. They are named in the law. Let it be assumed that, in this particular,

424                MARYLAND REPORTS.

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

the Legislature transcended its authority. As an inevitable consequence, the entire law would be avoided. No power of substitution would result to the Executive. By parity of reason, no dispensing power can be exercised by the Commissioners in the selection of their agents. They are to exercise the power delegated to them in the manner and form in which it has been delegated. And if there exists any constitutional obstacle to the exercise of the power *modo et forma* as the same has been delegated, the consequence must be nullity. The law must fail of effect for want of the necessary agents to exercise its functions. There is nothing in *Davis vs. The State*, 7 *Md. Rep.*, 160, inconsistent with these views. The point there decided was, that an entire statute is not to be avoided by the introduction of a single foreign or irrelevant subject into it, on the pretext that such subject is not plainly indicated by the title. On the contrary, the guarded terms of the proposition give strength to our argument. The exceptionable matter must be *foreign* or *irrelevant* to the main subject of the statute, and it is declared, that "if an Act of Assembly be composed of a number of discordant and dissimilar subjects, so that no one could be clearly recognized as the controlling or principal one, the whole law would be void." Now, here we have certain police powers delegated to a force, which is to possess certain qualifications, and to be selected by a particular commission. If the law is incapable of execution in regard to the police power designed to be exercised, or the appointing power, or the qualifications of the police force, in any one or other of these particulars, the whole law must fail.

*Johnson, Campbell, Norris* and *Wallis,* on the part of the appellees, submitted the following brief and points:

Before proceeding to lay down the propositions proposed to be argued on behalf of the relators in support of the judgment of the court below, it ought to be stated, that while the Act, referred to in the petition, creates the Board of Police, and defines some of its powers and duties, other duties and powers have been conferred on it by another law passed at the same ses-

sion, regulating elections in the city of Baltimore. This latter
Act is grounded on sec. 6, Art. 10, of the Constitution, which
authorizes the Legislature to regulate, by law, all matters re-
lating to the judges, time, place and manner of holding elec-
tions, and making the returns thereof, provided that the ten-
ure and term of office, and the day of election, shall not be
affected thereby. Accordingly, without touching the term or
tenure of office, or the day of election, further than to declare
between what hours the polls shall remain open, the Act last
alluded to, directs the time, place and manner of holding
elections in Baltimore. Among other things, it requires the
Board of Police to divide the wards into election precincts, to
appoint judges of elections and their clerks, and provides that
no election in the city, whether State, or Federal, or muni-
cipal, shall be valid, unless held under and in conformity to
it, and under and subject to the provisions of the Act referred
to in the petition establishing a permanent police in the city
of Baltimore, and under and subject to the control and com-
mand, as to all police purposes of the Board of Police of the
city of Baltimore.

All the questions at issue range themselves under two
heads: the *first* relating to the authority of the Legislature to
create a Board of Police, the members of which shall be ap-
pointed by itself; and the *second* relating to the powers con-
ferred on the Board.

As regards the ability of the General Assembly to create and
fill an office, it is sufficient to refer to two Articles of the Con-
stitution, viz:

Art. 2, sec. 11: "He (the Governor) shall nominate and,
by and with the advice and consent of the Senate, appoint all
civil and military officers of the State, whose appointment or
election is not otherwise herein provided for, *unless a differ-
ent mode of appointment be prescribed by the law creating
the office.*

Art. 3, sec. 24: "No Senator or delegate, after qualifying
as such, shall, during the term for which he was elected, be
eligible to any office which shall have been created, or the
salary or profits of which shall have been increased during

Mayor, &c., of Balto. *vs.* State, *ex rel.* of the Board of Police of Balto.

such term, or shall, during said term, hold any office or receive the salary or profits of any office, *under the appointment of the Executive or Legislature.* 7 *Md. Rep.,* 161, *Davis vs. The State.*

Referring to the particular provisions of this Act, supposed to be unconstitutional, the answer specifies them as follows:

1. In general, those which withdraw from the city any of the powers vested in it at the time of the adoption of the present Constitution, it being insisted that all such powers were recognized and confirmed to the corporation by that instrument.

2. The provision which puts under the control of the Board the existing police force in the city. This city police is affirmed to be a temporary additional police appointed by the city authorities under the last clause of sec. 19, Art. 4, of the Constitution.

3. The provision authorizing the Board to appoint a permanent police in Baltimore, it being asserted that the Constitution has defined the permanent police in that city to consist of the justices of the peace and constables.

4. The provision making it the sheriff's duty to act under control of the Board in the preservation of the public peace and quiet, and to call out the *posse,* if required by them, and enabling the Board, whenever the exigency, in their judgment, warrants, to assume the control and command of all conservators of the peace in the city of Baltimore.

5. The provision authorizing the Board to call out the militia in the city, to aid them in preventing threatened disorder or opposition to the laws, or in suppressing insurrection, riot or disorder on election days, and at other times, which is supposed to trench on the Governor's prerogative.

These objections exhaust the constitutional impediments in the way of the Act, but it is suggested that, for other reasons, it ought to be pronounced a nullity in law. These other reasons are:

6. That the Board are declared to be authorities of the city, and the city is made responsible for their defaults, while having no control over them.

## DECEMBER TERM, 1859. 427

Mayor, &c., of Balto. vs. State, ex rel. of the Board of Police of Balto.

7. That the city is burdened with the expenses of the Board and the police, and bound to raise the necessary funds, without power to supervise the estimates, and coerced to discharge this duty by being inhibited from collecting its ordinary taxes, unless it collects, at the same time, the police tax, and subjected, in case it fails to meet the Board's requisitions for moneys, to the issue of certificates in its name, which may be pledged or disposed of by the Board, and shall be receivable in payment of city taxes.

8. That the disability to hold office under the city, or the Act which is visited by the terms of the latter upon a forcible resistance to its provisions, is a disfranchisement unknown to the Constitution, and contrary to its spirit.

9. That the Fire Alarm Telegraph and other things of which the use is sought by the *mandamus*, belong to the city, and were purchased and paid for by it out of its proper funds for corporate uses and purposes, and that the exclusive use of all these things is necessary to the discharge of the duties of the corporation.

Before proceeding to notice in detail these several suggestions, it may be proper to advert to the fact that they all proceed upon the hypothesis that the police powers delegated to the Board, are restricted in their exercise to the limits of the city; but it will be observed, by referring to the Act, that their powers are not so limited. In case they have reason to believe that any persons within the city intend to commit any breach of the peace, or violation of law or order beyond the city limits, upon the Chesapeake bay, or other place on land or water in this State, it shall be their duty to cause such persons to be followed, and to suppress or prevent the meditated outrage, and arrest the offender, delivering him, if the crime be committed, to the proper authority, for trial and punishment; and they may also arrest, in any part of the State, any person charged with the commission of any crime in the city of Baltimore, and against whom criminal process shall have issued. Their authority, therefore, is not a merely local authority, but, in the cases specified, extends over the whole State; and for this, therefore, if for no other reason, it

is impossible to identify the Board with the mere local police functionaries of Baltimore. *People vs. Draper*, 25 *Barb.*, 374, and same case in error in 15 *New York*, 543.

1st. The first objection is, that the provisions of the Act infringe the constitutional powers of the Mayor and City Council of Baltimore, which was vested with all power of legislation for city purposes, according to the wants and wishes of the inhabitants of the said city; which city government, thus erected, endowed and established, is fully recognized and essentially confirmed to the city and its inhabitants by the existing Constitution; and that the Act renders it a different corporation, with different powers from those recognized and confirmed to the city by the existing Constitution. That the Mayor and City Council of Baltimore is recognized as a municipal corporation in the Constitution, is undoubtedly the fact, for it is twice mentioned in sec. 19, Art. 4, of the Constitution, and elsewhere in the instrument, and power is given to it to appoint constables in case of vacancies, and also to provide for an additional temporary police to preserve the public peace. But it by no means follows that such a recognition, with such a grant of power, amounts to an incorporation of the city by the Convention, with all its powers, as then conferred by statute. The construction is just the reverse. By the grant of two specified powers and no more, the Constitution excludes the notion of any other than the specified powers being derived from that instrument; and such a construction is fortified by its other provisions. The analogous governing bodies in the counties—the County Commissioners—though so named by the Constitution, and deriving from it a permanent existence, are yet, by sec. 8, Art. 7, made wholly dependent upon the Legislature for their powers and duties; and Art. 37 of the Bill of Rights, while confirming, in terms, to the city of Annapolis its rights agreeably to its charter, makes them expressly subject to alterations by the Legislature. That the mere mention of the city elsewhere in the Constitution, as an existing local division of the State for judicial and representative purposes, *ipso facto*, embodies its charter in the fundamental law, so as to place the whole be-

yond the pale of legislative power, is a proposition which, it is presumed, cannot be seriously advanced.   *Breese,* 120, 121, *Coles vs. County of Madison.*   4 *Scammon,* 273, *People vs. Wren.*   12 *Louisiana Ann. Rep.,* 515, *Layton vs. City of New Orleans.*   *R. M. Charlton,* 438 to 440, *State vs. Deus.*   15 *New York,* 541, 542, 543.

2nd. The second objection is that the Act puts under the control of the Board, the existing police of the city of Baltimore, consisting of a marshall and other officers and men, which existing police is affirmed to be an additional temporary police appointed by the city authorities, under the last clause of sec. 19, of Art. 4, of the Constitution.   It is conceded that this section authorises the city to provide by ordinance for the creation and government of an additional temporary police, for the preservation of the public peace, but it is denied that the existing police in the city, of which the Board are authorized to assume the control, is such an additional temporary police, or that it was created under the section alluded to.   The character of the force must be determined by the municipal legislation which called it into existence.   This police was first created by an Ordinance approved January 1st, 1857, and entitled, "An Ordinance to establish a Police for the city of Baltimore."   Its first section abolishes the existing watch and police systems, and repeals all ordinances for the establishment and regulation of the same, and with this introduction it proceeds to create and organize a new police system, consisting of 44 officers of various grades, and 363 men, including turnkeys and detectives, all of them to hold their appointments for a year, and provided with batons, revolvers and muskets, at the city's expense.   The permanent character of this force is further illustrated by sec. 21, which authorises the Mayor to call out and arm any number of special police which he may deem necessary to preserve the peace, but declares expressly that such special police officers shall be retained no longer than is necessary for the protection of the peace on the occasion. The special police, when appointed under this section, constitute a police additional to that created by the other sections

and are temporary, because only employed to preserve the peace in an emergency, and ceasing when peace is restored, while the force described in the other sections has no temporary function to fulfil, but is required by sec. 2, to do duty by day and night throughout the year, and to enforce the Ordinances and Acts of Assembly, and exercise the general functions of a police organization. Such was the character of the ordinary city police as impressed on it by the Ordinance of January 1st, 1857, creating it and superseding all others, and such it continued to be at the time of the passage of the Police Act, by virtue of the Revised Ordinances of June 11th, 1858, in force when that Act passed. This second and subsisting Ordinance is likewise entitled, "An Ordinance to establish a Police for the city of Baltimore," and is, in fact, with some immaterial variations, a re-enactment of the Ordinance of January 1st, 1857, containing, among other things, a repetition, in terms, of the 21st sec. of that Ordinance, which provides a special police for extraordinary occasions, with no other power than that of preserving the peace. Nothing, therefore, can be plainer than that the police force in the city of Baltimore, at the time of the passage of the Police Act, consisting, as described in the answer, of 44 officers and 363 privates, was a permanent as contra-distinguished from an additional temporary police. It was never called by the latter name until it was so called in the answer in this case, and the language of the Ordinances which brought it into existence and continued it, establishes the erroneousness of this new appellation. The objection, therefore, under consideration, which puts the unconstitutionality of the Act on the ground of its giving the Board control of the present police, because such a police is a temporary and additional police, fails, for the reason that the police is not a temporary and additional force, but a permanent police, and so not created or upheld by virtue of sec. 19, of Art. 4, of the Constitution.

3rd. The third objection is that the Act empowers the Board of Police to appoint a permanent police in Baltimore, though the Constitution has determined that the permanent

police of that city shall consist of its justices of the peace and constables.  Sec. 19, of Art. 4, of the Constitution, is relied on for this view.  It is said that the last clause in that section authorizes the Mayor and City Council of Baltimore to provide, by ordinance, for the appointment of a temporary additional police to preserve the public peace, and as an additional police implies another police, to which the former is to be additional, it is contended that we must look to the prior part of the section for the permanent body which is thus to be temporarily added to.  The prior part of the section provides for the election of justices and constables, and they are consequently assumed to have been, in the contemplation of the Convention, a permanent police, the existence of which, derived from such a source, is supposed to negative the power of the Legislature to create, or authorise the creation, of any other permanent police.  If the justices and constables were meant to be a permanent police, they are not so declared in terms.  And to supply this defect, it is urged that they are declared to be Conservators of the peace, and that these words make them policemen.  But this language clothes them with no other character which they did not possess without it, and merely expressed what was implied by the offices they hold.  Both justices and constables, as well as judges and the sheriff, are, *virtute officii,* conservators of the peace.  2 *Hawk. Pleas of the Crown,* 43, 44, 45.  These words, therefore, accomplish nothing that was not accomplished by the mere mention of justices and constables, and add, consequently, nothing to the force of those terms.  If they could be supposed to do it, and their use were attended with the consequences claimed, it would follow from sec. 6 of the same Article, which makes the judges of the Court of Appeals, of the Circuit Courts, and of the courts of the city of Baltimore, conservators of the peace, that all these high functionaries are policemen as well as the Baltimore justices and constables.  All that the present Constitution has done, in regard to justices and constables, is simply to change the mode of their appointment, leaving their powers and duties (though not the jurisdiction of the former) to the

discretion of the Legislature. How can it be possibly inferred from such dealing with these officers, that the Constitution meant to invest them with a character which they never possessed before, and which is absolutely inconsistent with the discharge of their constitutional functions?

The title of the 4th Article, and its first section, are the best guides to its true construction. Its title shows that it dealt with the judiciary department, and its first section declares that the judicial power shall be vested in a Court of Appeals, in Circuit Courts, in such courts for the city of Baltimore as may be thereinafter prescribed, and in justices of the peace. The scope of the whole Article is the creation of judicial tribunals and their accessaries in the administration of justice. Without clerks, or registers and sheriffs, the courts would be unfurnished for the discharge of their functions, and so these ministerial officers are given them, while for the same reason, in the section which provides for the election of justices, they are supplied with their necessary attendants in the constables. In 1 *Burns' Justice, Title Constable, sec. 5,* it is said: "It hath always been holden that a constable is the proper officer to a justice of the peace, and bound to execute his warrants." The general intent and purpose of the Article, therefore, in which the section about justices and constables is found, defines the construction to be given to it, and negatives any presumption that the functionaries named in it were to be such as are wholly unconnected with the administration of justice. For it must not be overlooked, that policemen are altogether a different class of officials from those whose duty it is to attend on the tribunals of justice. These latter are put in motion by writs or warrants. The policeman, on the contrary, is rather an arm of the executive than the judiciary, and in guarding the public health, in removing nuisances, in protecting strangers, emigrants and travellers, and many other instances, his duty is rather to prevent crime and trespasses on person and property, than to punish or bring to justice the one or the other. And this view of the essential character of a police shows how impossible it is to consider the Constitution as having regarded in such a light the justices and con-

stables. The 19th sec. groups them together, and if the word "additional," in its last clause, refers to them, it refers to both of them, as must be conceded, and is, in point of fact, conceded by the answer. Now, unreasonable as it would be to adopt a construction, even in regard to constables, which would make it their duty, instead of attending on the justice for the execution of his warrants, to be constantly engaged, by day and night, in other functions consuming all their time, it becomes wholly indefensible when applied to the justices. How would it be possible for them to fulfil their judicial duty, if obliged to be always absent from their place of business in the discharge of the multitudinous avocations of a policeman? The Acts of 1847, ch. 77, sec. 10, and 1854, ch. 225, imposing upon them office hours and official localitis, would, by such a construction, be absolutely set at naught.

If then sec. 19, of Art. 4, creates no police what force was in view of the Convention when, in the conclusion of that Article, it authorizes the Mayor and City Council of Baltimore to create an additional police? To what police was the one so created to be additional? The answer is a very plain one. It was to be additional to the permanent police then existing in the city of Baltimore under merely legislative sanction, and it was to be temporary, because its existence was only authorized for a single purpose, viz., that of preserving the public peace in case of necessity, and, therefore, necessarily limited to the duration of occasional outbreaks which interrupted, or threatened to interrupt, the public quiet. At the time of the adoption of the Constitution there was in existence, in the city of Baltimore, a force known by the name of the city police, created long before and actually subsisting at the time under a revised Ordinance of 1850, (*Rev. Ord. of* 1850, *page* 98.) The provisions of this Ordinance establish that the force organized by it was a permanent police force in the proper and ordinary acceptation of that term, clothed with police powers and duties. The authority to make it was derived from the Act of 1812, ch. 194, which empowered the Mayor to appoint, during pleasure, not less than 25, nor more than 100, bailiffs to aid in preserving the peace, maintaining

the laws and advancing the police and good government of the city, and from the Act of 1817, ch. 148, sec. 3, which enlarged the powers of these bailiffs and gave their appointment to the Mayor and Councils.   Under these Acts Ordinances were passed, from time to time, until in 1838, (*Rev. Ord.*, 1838, *page* 112,) an Ordinance was enacted, entitled "An Ordinance for the appointment of a High Constable, City Bailiffs and for other purposes," in which the force was organized under a head denominated "Chief of Police," and the force itself called by the name of the City Police. This Ordinance was followed by the Ordinance revised in 1850 and above referred to, which like its predecessor embodies, arranges and describes the bailiffs of the city as the police of Baltimore.   Nothing, therefore, can be clearer than the existence in 1850 of a permanent police in the city of Baltimore, dating from the Act of 1812, and charged with the performance of ordinary police duties.   It would be a waste of time to do more than say, that it must have been to this force that the *police* provided for in the close of sec. 19, of Art. 4, was to be *additional*.   A further ground for the same conclusion is furnished by the fact, that during the whole period, from 1812 to 1850, justices and constables were discharging their duties, civil and criminal, in the city of Baltimore; were conservators of the peace as now and were quite distinct from the police; never known by that appellation, nor clothed with the powers or burthened with the duties belonging to such a force.   This simple and obvious construction of the Constitution, is sanctioned by the subsequent conduct of all parties concerned.   The Legislature by the Act of 1853, ch. 46, entitled, "An Act to provide for the better security of life and property in the city of Baltimore, by increasing and arming the police thereof," repealed, and in repealing recognizes, the then continuing force and operation of the Act of 1812, ch. 194, which limited the appointment of city bailiffs to the number of one hundred, and at the same time that it left the number to the unrestricted discretion of the Mayor and City Council, authorized the arming of the city police. And the city authorities, by the Ordinance of 1857, already

referred to, acted upon the powers conferred by the Act of 1853, and, for the first time in their history, appointed more than 100 policemen and gave them arms. If the theory now advanced be correct, that the justices and constables are by the Constitution made the permanent police of the city, the Act of 1853 was unconstitutional, and its passage, and the city's action under it, were not merely an error, but worse, because an unauthorized force was equipped with deadly weapons in pursuance thereof. Nor does it appear alone by the positive enactments of 1853, that the Legislature treated, and meant to treat the permanent police for Baltimore, as wholly independent of the justices and constables. The same intention had already been made negatively manifest by the Act of 1852, ch. 274. This Act passed at the first session after the adoption of the Constitution, assigned to the whole city of Baltimore only twenty-four justices and forty-four constables, being sixty-eight in all—thirty-two less than the number of the police force already existing under the Acts of 1812 and 1817. The designation of a number so absurdly small for the wants of a population which had more than doubled since these last named Acts were passed, is, of itself, a conclusive demonstration that the justices and constables were regarded only in the light of their ancient and ordinary capacity and functions, and with no reference whatever to the extraordinary position now sought to be assigned to them. The date of the Act of 1852, gives to its provisions all the weight of a contemporaneous constitutional interpretation, and the number of the justices and constables then designated has not been enlarged.

If these observations be correct, the construction of sec. 19, of Art 4, of the Constitution is not open to any doubt. But, even if it were conceded that the construction is doubtful, the result would practically be the same. Nothing short of a clear denial of power to the Legislature can incapacitate it for performing the function for which government is mainly instituted—the protection of life and property. Such a denial may no doubt be implied as well as expressed, but whether in one shape or the other, it must be too plain for

controversy. 25 *Barb.*, 374, *People vs. Draper*, and same case in 15 *New York*, 534, 543, 546. 5 *Cowen*, 540, *Presbyterian Church vs. Mayor, &c., of New York.* 18 *How.*, 356, *Dodge vs. Woolsey.* 6 *Wheat.*, 596, *Goszler vs. Corporation of Georgetown.* 3 *H. & J.*, 322, *Partridge vs. Dorsey.* 9 *Wheat.*, 204, *Gibbons vs. Ogden.* 7 *Gill*, 325, *Day vs. The State.* 19 *Barb.*, 83, *De Camp vs. Eveland.* 2 *Scammon*, 81, 95, *Field vs. The People.* 11 *Iredell*, 560, 563, *Mills vs. Williams.* R. *M. Charlton*, 432, 439, *State vs. Dews.* 13 *B. Munroe*, 22, 23, *Slack vs. Maysville Road.* 7 *Md. Rep.*, 146, *Manly vs. The State.* 12 *G. & J.*, 431, *State vs. Balto. & Ohio Railroad Co.* 9 *Geo.*, 527, *Shorter vs. Smith.* 2 *G. & J.*, 256, *State vs. Wayman.* 9 *Md. Rep.*, 328, *Buckingham vs. Davis.* 12 *Louisiana Ann. Rep.*, 515, *Layton vs. City of New Orleans.* 5 *Gill*, 231, *Gordon vs. Mayor & C. C. of Balto. Ibid.*, 393, 396, *Alexander vs. Mayor & C. C. of Balto.* 10 *Missouri*, 410, *Baldwin vs. Green.* 13 *Missouri*, 414, *St. Louis vs. Allen.* 11 *Louisiana Ann. Rep.*, 370, *New Orleans Draining Company's Case.* 9 *Gill*, 305, *Baugher vs. Nelson.* 13 *Conn.*, 125, *Pratt vs. Allen.* 6 *Gill*, 292, *Mayor & C. C. of Balto. vs. Balto. & Ohio Railroad Co.* 6 *California*, 364, 365, *Ross vs. Whitman.* 21 *Geo.*, 86, *Savannah vs. Hussey.* 10 *How.*, 534, *East Hartford vs. Hartford Bridge Co.* 17 *Geo.*, 56, *Hamrick vs. Rouse.* 16 *Pet.*, 610, *Prigg vs. State of Pennsylvania. Ibid.*, 411, *Martin vs. Waddell.* 2 *Md. Rep.*, 449, *Wright vs. Wright.* 11 *Pet.*, 547, *Charles River Bridge vs. Warren Bridge.* 1 *G. & J.*, 474, *Crane vs. Meginnis.* The following Acts, passed since the adoption of the present Constitution, show the exercise by the Legislature of the power to appoint police officers in other parts of the State besides the city of Baltimore: 1854, *ch.* 44, sec. 5, *ch.* 282, sec. 8; 1856, *ch.* 177, *ch.* 312; 1858, *ch.* 73, *ch.* 166, *ch.* 373. And in the volume of Public Local Laws, adopted at the last session of the General Assembly, will be found numerous instances of similar legislation.

4th. The fourth constitutional objection is to the provision making it the sheriff's duty to act under the Board in the

DECEMBER TERM, 1859. 437

Mayor, &c., of Balto., vs. State, ex rel. of the Board of Police of Balto.

preservation of the public peace and quiet, and to call out the *posse*, if required by them, and enabling the Board, whenever the exigency, in their judgment, requires it, to assume the control and command of all conservators of the peace in the city. There is no clause in the Constitution giving to any one conservator of the peace the control of any other, and, least of all, to the sheriff, for sec. 20 of Art. 4, which mentions the office and provides for filling it, does not describe him as a conservator of the peace, though that title is conferred on the judges, justices and constables. Yet there can be no doubt that he is a conservator of the peace, by virtue of his office and the common law, and so are the judges, justices and constables in Baltimore by express designation. The very existence of so numerous a body of functionaries, charged with a single duty and independent of each other, calls for such a regulation as shall cause them to work together in harmony, and nothing in the Constitution forbids such an arrangement, which is eminently calculated to make effective its provisions as to the preservation of the public peace. 25 *Barb.*, 362, *People vs. Draper.*  R. M. *Charlton*, 404, 407, 432, 440, *State vs. Dews.*  3 *Humph.*, 482, *Haynes vs. The State.*  10 *How.*, 416, *Butler vs. State of Pennsylvania.*  2 *Sandford*, 369, 375, *Connor vs. Mayor & C. C. of New York.* 15 *Ala.*, 523, *Benford vs. Gibson.*

5th. The fifth and last constitutional objection is, that the power vested in the Board to call out the militia in certain cases, is an interference with the Governor's constitutional prerogative under sec. 9 of Art. 2 of the Constitution. There is nothing in this provision which looks like exclusion of the executive authority in regard to the calling out of the militia. Its terms are permissive only; and, in other States, where a similar power is lodged in the executive, it has been the uniform construction that the Legislature is competent to direct in what cases and by whom the militia, or a part of it, may be ordered on duty. And such has always been the practical construction in this State of the power in question. The 33rd section of the Constitution of 1776, gave the Governor, "alone, the direction of the militia;" yet, under it, Acts were

passed making it the duty of subordinate officers to bring their commands into the field on the requisition of certain civil officers. 1798, ch. 100, sec. 10; 1807, ch. 128, sec. 6; 1813, ch. 19, secs. 2, 4; 1816, ch. 193, sec. 18; 1823, ch. 188, sec. 70; 1834, ch. 251, sec. 57; 1835, ch. 14, sec. 9, and ch. 107.

The remaining objections to the Act rather concede that there is no constitutional foundation for them, but that they repose on some higher law.

6th. The sixth objection is to the declaration contained in sec. 19 of the Act, that the Board shall be considered as one of the city authorities; and it is insisted that the city ought not to be made liable for the defaults of those over whom it has no control. Upon the assumption of the answer, that the justices and constables are the permanent police of the city of Baltimore, and so charged with the preservation, ordinarily, of the public peace, the same state of things exists. The corporation of Baltimore neither appoints nor controls the justices or the constables, (except in the case of a vacancy in the office of constable,) and the power to create a "temporary" police, exists as well under the Act now in controversy, as under the construction assumed on the other side, to be the true one. But the ground of the objection is altogether untenable. There is no inherent right in the citizens of any particular locality—and certainly none in any municipal corporation—to elect or choose their own functionaries. Their existence as a separate organization for local purposes, is derived from, and is wholly dependent on, the legislative will; and that will determines not merely what powers of local government shall be delegated, but to whom the delegation shall be made. In whatever way appointed, the local functionaries represent the citizens of the locality only, because the State authorizes them to act for that portion of its citizens. The Board of Police, therefore, within its sphere, is just as much the representative of the people of Baltimore as the corporation. 13 B. Monroe, 23, Slack vs. Maysville Road. 21 Penn. State Rep., 162, Sharpless vs. Mayor of Philadelphia. But even if it were otherwise, the question is one of

DECEMBER TERM, 1859.                     439

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

expediency, merely, and, therefore, not of judicial cognizance.

7th. The seventh objection assails the law, because it calls on the city to raise taxes without giving it a voice in fixing their amount, and contains provisions to coerce obedience to this direction. With the same propriety, the city might demur to collecting the State tax from the citizens of Baltimore, and assert an inherent right to tax without State authority. That the taxing power is exclusively in the Legislature, under the Constitution, is undeniable. The 12th Art. of the Bill of Rights provides, that "no aid, charge, tax, burden or fees, ought to be rated or levied under any pretence, without the consent of the Legislature." It is only by the consent, therefore, of the Legislature, that the corporation of Baltimore can levy and collect taxes under the Constitution; and it exercises the power to tax under such limitations and restraints as may be imposed by the Legislature. 13 *B. Monroe*, 25, 26, 27, *Slack vs. Maysville Road*. 3 *Kernan*, 143, *Guilford vs. Supervisors of Chenango Co.* Instances of just such legislation as that complained of, are to be found throughout the Acts of Assembly. *Act of April*, 1782, *ch.* 39; 1797, *ch.* 73; *November*, 1796, *ch.* 68, *sec.* 14, (the first city charter;) 1805, *ch.* 91; 1816, *ch.* 193, and *ch.* 218, *sec.* 2; 1817, *ch.* 142, *sec.* 5; 1818, *ch.* 141, *sec.* 2; 1823, *ch.* 187; 1834, *ch.* 151; 1837, *ch.* 24; 1854, *ch.* 144; 1856, *ch.* 280; 1858, *ch.* 39, and *ch.* 91.

8th. The eighth objection is to the disfranchisement for city offices, or offices under the Act, of those who forcibly resist it. The language of the objection concedes that there is no express provision of the Constitution violated by this provision. It is said to be unknown to that instrument, and contrary to its spirit. As the Constitution does not define the qualifications of those who are to hold office under the city or Act in question, it is clearly within the power of the Legislature to define those qualifications in any way it pleases. 4 *Md. Rep.*, 223, *Thomas vs. Owens*. 3 *Cowen.*, 703, 706, *Barker vs. The People*.

9th. The ninth and last objection to the Act is, that it re-

quires the city to allow the use of the Fire Alarm Telegraph and other things which belong to it, for the service of the new police. There is no allegation that these things were a gift to the city, or conveyed to it on any special trusts. They are averred to belong to it absolutely, and to have been purchased for corporate uses and purposes, and paid for out of the proper funds of the corporation. They were acquired, therefore, as the ordinary fruits of taxation, by the exercise of powers derived from the State for public purposes, and are, consequently, in no sense, private property. The theory which seeks to make them private property, confounds the distinction between public and private corporations. It has been settled in this State, and in the other States, and by the Supreme Court, that municipalities are public corporations, and that in regard to the property acquired by them for public purposes, through public instrumentalities, the Legislature has complete and plenary power of direction and disposition. The claim of the petition is only to use the property in question, as it is used by the existing police, and the concession of the answer that it is used by the existing police, is an admission that it may be used by the new police without destroying or impairing its use for any other necessary corporate purpose. *Maycr & C. C. of Balto. vs. Lemmon*, decided by the Court of Appeals in 1838, and not reported. 9 *G. & J.*, 401, *Regents' Case.* 12 *G. & J.*, 440, *State vs. Balto. & Ohio Railroad Co.*, and same case in 3 *How.*, 550. 10 *How.*, 535, 536, *East Hartford vs. Hartford Bridge.* 8 *Md. Rep.*, 101, 102, *Mayor & C. C. of Balto. vs. Root.* 4 *Wheat.*, 660, 661, *Dartmouth College Case.* 2 *Kent.*, 275. 3 *New Hamp.*, 530 to 535, *Bristol vs. New Chester.* 8 *New Hamp.*, 323, *Londonderry vs. Derry.* 34 *New Hamp.*, 275, *Berlin vs. Gorham.* 3 *Williams*, (*Vt.*,) 12, 13, 18, 19, *Montpelier vs. East Montpelier, et al.* 23 *Conn.*, 419, *Town of Granby vs. Thurston, et al.* 24 *Wend.*, 69, *Thomas vs. Leland.* 3 *Hill*, 539, *Bailey vs. Mayor, &c., of New York.* 25 *Barb.*, 366, *People vs. Draper.* 21 *Penn. State Rep.*, 202, *Moers vs. City of Reading.* 13 *B. Monroe*, 26, 33, *Slack vs. Maysville Road.* 17 *Geo.*, 59, 60, *Hamrick vs. Rouse.*

22 Geo., 531, 536, Dart, et al., vs. Houston, et al. 12 Louisiana Ann. Rep., 515, Layton vs. City of New Orleans. 11 Humph., 583, Daniel vs. Mayor & Aldermen of Memphis. Breese, 120, 121, Coles vs. County of Madison. 4 Scammon, 273, 275, 277, People vs. Wren. 11 Iredell, 563, Mills vs. Williams.

Campbell and Johnson, for the appellees, argued, at length, in support of the points presented in the aforegoing brief.

In reference to the power of the Legislature to appoint the Commissioners, they insisted that the two clauses of the Constitution, referred to in the brief, and the decision in Davis vs. The State, 7 Md. Rep., 151, were conclusive of the question. But they further insisted that the power of appointment to office was not, under our form of government, and never has been, a purely and inherently executive function. The 6th Art. of the Bill of Rights of the Constitution of 1776 and 1836: "That the legislative, executive and judicial powers of government ought to be forever separate and distinct from each other," asserts the general principal of the separation of these several departments, in just and strong language as the corresponding Article in the present Declaration of Rights, and yet it was never supposed that it prohibited the Legislature from making appointments to office. The Statute Books of the State are full of instances of such legislation. As examples they referred to the Acts of 1782, ch. 39; 1797, ch. 73; 1805, chs. 91, 92 and 114; 1803, ch. 44; 1804, ch. 82; 1807, ch. 160; 1816, chs. 123, 218, 232 and 250; 1817, chs. 115, 130, 131 and 132; 1834, ch. 151; and 1835, ch. 58. In the case of Crane vs. Meginnis, 1 G. & J., 476, the court define and explain the meaning of this political maxim in the 6th Art. of the Dec. of Rights, and say that it has made its appearance, in some form, in all the State Constitutions formed about the time of the war of the Revolution, and is said to have been borrowed from Montesquieu's Spirit of Laws, 181; that in whatever terms they have adopted it, in none of these Constitutions are the several departments kept wholly separate and unmix-

ed; that in each of them it seems to have been the intention to engraft this invaluable maxim of political science on their respective systems only so far as comported with free government, and to prohibit the exercise by one department of the powers of another department, or to confine each department to the exclusive exercise of its own powers; and that the inhibition goes to the *practical* exercise of powers conferred by the Constitution and to be used after it is in operation, and does not apply singly to the original distribution of powers among the departments of the government. The case of the *State, ex rel. Attorney General vs. Kennon*, 7 Ohio, (N. S.,) 546, cannot aid the appellants, for there was in the Constitution of Ohio an express provision, that *"no appointing power shall be exercised by the General Assembly*, except as prescribed in this Constitution and in the election of United States Senators;" and, upon this prohibition, it was decided in that case that the Legislature could not make the appointments there contested, and it was conceded that but for this express prohibition the Legislature would have had the power to make the appointments.

In regard to the argument that because the Constitution recognizes the city of Baltimore as part and parcel of the organized government of the State, its charter is therefore placed beyond the power of the Legislature to modify or change it, in addition to the authorities and points in the brief, they insisted that such a recognition could have no more effect in regard to the city than the counties, for the latter are recognized by the Constitution in the same manner as the city of Baltimore. The result of this argument is, that the State would be deprived of all power whatever to discharge one of the most important objects for which governments are established. If this recognition makes the charter a constitutional charter, and adopts it at all, it adopts it with all the powers, limits and franchises which the city had at the date of the Constitution. And yet it will hardly be pretended that it is beyond the power of the Legislature to enlarge the limits of the city, by bringing portions of the county within its borders, to confer upon the city authorities the

discharge of other duties than those they now possess. Such has never been the construction of the Constitution. By the Act of 1838, ch. 208, the Mayor and City Council were authorised to levy thereafter upon the assessable property within the city by direct tax, a sum *not exceeding* $350,000 *annually*. By the Act of 1853, ch. 233, the law of 1838 was amended so as to allow the levy, by direct tax, of a sum not exceeding $500,000 annually, and by the Act of 1858, ch. 68, this was again amended so as to allow a levy of a sum not exceeding $800,000 annually. How could these latter Acts be passed if the Constitution fixes and establishes the Act of 1838, which was a part of the city charter, beyond the power of legislative control? The charter of the city, from the day of its passage to the present, has constantly been subject to alteration and amendment by the Legislature, and the inconveniences which would result from now placing it beyond the power of such alteration and amendment, are so obvious that they need not be pressed. Nothing but plain and explicit language in the Constitution could effect such a result. Such language, in this respect, cannot be found in that instrument, and it is clear that the people when they adopted it, never supposed they were parting with the power to govern and control the city of Baltimore, and to pass such laws as they might deem the public good required to meet the constantly changing and increasing necessities of its population.

In reply to the argument, that the provision in the law authorizing the Commissioners to issue certificates of indebtedness, was in violation of that clause of Art. 1, sec. 10, of the Constitution of the United States, which forbids the States to "emit bills of credit," they insisted that this clause had no application to such a case as this. The thing prohibited is emitting bills of *credit,* and the object of the prohibition was to strike down *paper money* issued upon the *faith* of the *States alone.* It was never designed to prohibit the States from contracting debts, and giving bonds or certificates of indebtedness as evidences of such debts. 4 *Pet.,* 410, *Craig, et al., vs. State of Missouri.* 11 *Pet.,* 257, *Briscoe, et al.,*

444          MARYLAND REPORTS.

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

*vs. Bank of the Commonwealth of Kentucky.* Besides, if
these certificates should be invalid for this reason, the same
objection would apply equally to bonds issued by the city for
the payment of other debts contracted by it, and constituting
city stock. Nor is it any objection to the law that it author-
izes these certificates to be taken in payment of taxes. Such
a mode of payment has frequently been resorted to by the
Legislature, and is sanctioned by the principle decided by
this court in the case of *Foley & Woodside vs. Mason,* 6 *Md.
Rep.,* 37. But this objection, as well as that of usury, which
is equally untenable, is not now properly before the court, for
these certificates have not yet been issued, and the necessity
for issuing them may never occur.

The proviso, that "no Black Republican, or endorser or
supporter of the Helper Book, shall be appointed to any office
under said Board," is said to be an objection to the law, be-
cause it proscribes persons for the sake of their political opin-
ions. But, if such proscription was designed, it is totally at
variance with that other provision of the law, in this respect,
which requires the Commissioners to take an oath that they
will not appoint any person to, or remove any person from any
office, under the law, "for or on account of his political opin-
ion." It is a provision interjected into the Act repugnant to its
whole scope and object, and if obnoxious to the objection, that it
imposes a disqualification for office not sanctioned by the
Constitution, it will be stricken from the law without impair-
ing the efficiency of other parts of it. 7 *Md. Rep.,* 151, *Davis
vs. The State.* But it is impossible for this court to say, ju-
dicially, what class of persons are meant to be excluded by
this proviso, and no decision can be pronounced as to the
effect thereof.

The argument, that this law, independent of any constitu-
tional restrictions, is void, because it is supposed to violate
some fundamental principles of right and justice inherent in
the nature and spirit of the social compact, and that therefore,
the courts can declare it void, can have no force in this case,
even if the principle announced be correct. There are no
such objections to the law. But if there were, this court

can only decide upon the question of *power* in the Legislature to pass it, and whether they have that power or not, depends upon whether there is any express or necessarily implied prohibition in the Constitution to forbid its passage. If there is not, and the Act be in its nature *a law*, there is no power in the court to declare it unconstitutional. 21 *Penn. State Rep.*, 162, *Sharpless vs. Mayor of Philadelphia.* 75 *Eng. C. L. Rep.*, 455, 457, *Woodward vs. Watts*.

*Wm. Schley*, for the appellants, in reply, stated, he would argue in support of the following four propositions:

1st. The relators were not constitutionally appointed Commissioners.

2nd. The police force which, by the Act, the Commissioners are authorised to organize, if the same be appointed in manner and form as thereby required, will not be a constitutional police force.

3rd. The Act, in its provisions, is not merely subversive of the city government, but, in some of its provisions, is repugnant to the most cherished principles of civil liberty, and is arbitrary, oppressive and unjust; especially so in imposing on the city, as constituted authorities of the city, without its consent and against its will, a Board of Commissioners, clothed by the Act with powers both governmental and administrative, paramount, in fact, to those of the Mayor and City Council; clothed with unlimited power of compelling taxation at their mere discretion, through the action of the City Council; clothed with a right to raise money in the name, and on behalf and on the credit of the corporation, at usurious interest; all which and other powers are conferred on said Commissioners in subversion of the city government, with a provision, at the same time, that the city shall be responsible and liable to answer in damages for any acts of misfeasance, and of malfeasance, and for all omissions of duty, on the part of the said Commissioners. For which reasons, said Act ought not to be enforced by the courts of justice as valid and operative, but ought to be denounced as a mere nullity in law.

4th. Even if any or all the aforegoing propositions should

be overruled, yet, upon the case presented by the record, the appellant is entitled to retain for the use of its own proper police, the property demanded by the relators in their petition. And in the discussion of this proposition it will be insisted, that the right of the city to maintain and govern a police force of its own, is effectually secured by the Constitution from legislative destruction; and, further, that the present police force of the city was lawfully created by a valid Ordinance of the city, and now exists as a lawful municipal institution, effectually protected by the Constitution of the State.

1. In support of the first proposition, he referred to the cases of *Whittington vs. Polk*, 1 *H. & J.*, 242. *Crane vs. Meginnis*, 1 *G. & J.*, 472. *The Regents' Case*, 9 *G. & J.*, 410, as clearly deciding that the affirmative declaration in *Art*. 6 of the *Bill of Rights* of the Constitution of 1776, that the executive, judicial and legislative departments of government should be separate and distinct, was, in effect, prohibitory. No one of said departments could constitutionally invade the province or exercise the functions of another. In the present Constitution this Article is retained, with this significant addition, *"and no person exercising the functions of one of said departments shall assume or discharge the duties of any other."* The prohibition which previously rested on the sanctity of judicial construction, is now, in express words, made a part of the Constitution. The Legislature, therefore, cannot *constitutionally* exercise executive functions. The appointment of officers is strictly administrative, and properly pertains to the executive department. These Commissioners are officers. They have large powers, and liberal compensation. He cited *Attorney General vs. Kennan*, 7 *Ohio*, (*N. S.,*) *Rep.*, 556. Even the *policemen* whom these Commissioners are authorised to appoint, are officers. *Brashear's Case*, 8 *Md. Rep.*, 95. If the Legislature cannot, *per directum*, appoint the policemen, they cannot validly do so through the action of the Commissioners. By sec. 11 of Art. 2 of the Constitution, it is expressly provided, that the Governor shall nominate, and, by and with the con-

'sent of the Senate, shall appoint *all* officers, whose appointment is not provided for in the Constitution, *unless a different mode of appointment be prescribed by the law creating the office.* In commenting upon the last clause of this section, he insisted that it must be construed in connection with Art. 6 of the Bill of Rights. They are parts of a whole, and should stand, if possible, together. If this clause were held to contain an implied grant of power to the Legislature, when creating new offices, to appoint, by the law itself, the officers to fill them, it would be idle to claim that the several departments of government in Maryland are separate and distinct. By this Act the Legislature usurped executive power in the very teeth of the prohibitory words of the Constitution. He further insisted it would not be an unreasonable construction of this clause to hold, that it was intended to apply only to those offices *antecedently* created, for whose appointment no provision was made by the Constitution. It was introduced, from abundant caution, to prevent possible embarrassment; not as an enlargement of the power of the Legislature. But, he insisted, that, even if considered as a grant of power *to prescribe* a mode of appointment in the case of a new office thereafter to be created; still it cannot be held, by any just construction, to authorize the Legislature *itself* to make the appointment in and by the very law creating the office. They are different functions. One is *legislative;* the other essentially *executive.* And, he further insisted that, even if the Legislature could prescribe, by the law, that the officers to fill the offices should be elected by the concurrent vote of both branches; yet in thus *electing* officers, the Legislature would not be acting in its *legislative* capacity but, *pro hac vice,* would be exercising an *administrative* function.

He insisted that the various Acts which had been referred to, appointing trustees of academies, commissioners to open roads, to build public edifices, &c., were of no value in a question of this kind. There is a broad difference between an *office* and a naked *power.* Besides, the validity of such Acts have not been particularly considered by the courts of

Maryland. They are usually passed on request. No usage can sanctify a violation of the Constitution.

2nd. In support of his second proposition he said, that if the police force, for whose use the property is demanded, be an *unconstitutional* body, it would follow, as a corollary, that the *mandamus* should be refused. He stated that, if appointed pursuant to this Act, they would be an unconstitutional body for two reasons: firstly, because appointed by persons having no title, nor even color of title. The doctrine in relation to acts of persons who are officers *de facto*, although not *de jure*, cannot apply here. Secondly, because the Bill disfranchises persons who are not disfranchised by the Constitution. Eligibility to office is a general right. 'Our Constitution disfranchises, in reality, only the unpardoned convict and the duellist. This Act proscribes supporters of the Helper Book and Black Republicans. In so doing, it violates the Constitution. What will become of the liberty of the press, of the liberty of speech, of the freedom of thought, if such legislation is tolerated? Shall we proscribe a citizen because he may approve, in politics, a particular platform of dogmas, which the body of the community may justly condemn? Let no man be prescribed in our State for his opinions merely, whether religious, speculative or political. Overt acts, not opinions, are the proper subject for just punishment. This Act, in truth, re-asserts the exploded doctrine: *voluntas reputabitur pro facto.* He approved the sentiment of Mr. Jefferson, that errors of opinion may be safely tolerated where reason is left free to combat them. He referred to the *Declaration of Rights, Art.* 38; *Maryland Code,* 225; 11 *Geo. Rep.,* 365; 1 *Leiber on Civil Liberty,* 109, 114, 118.

3rd. In arguing the third point, he said he would pass over many provisions which he deemed exceptionable, without discussion. In relation to the power conferred on these Commissioners to call out the militia, he said it was a very delicate power, that ought not to have been conferred upon any officer lower than the highest functionary in the State. But he dwelt at length upon the provision in the Act which authorizes the Police Commissioners to estimate the amount of

taxes to be levied for the support of the police force. He said it was arbitrary and despotic. The sovereign of Great Britain, in all the plentitude of regal power, would not attempt such action. It is nothing to the purpose to say that we have a guaranty in the character of the persons named as Commissioners, that the power will not be abused. But they have not only the power to prescribe what shall be assessed; they have the power to require payment *in advance*, thus *compelling* the corporation to *borrow* money to meet these requisitions. A still more obnoxious provision is the power given to the Commissioners to issue *certificates of indebtedness* in the name and on behalf of the city, and to *sell* them in the market for whatever they will bring. This is sanctioning rank usury, and is, at least, against the spirit, if not the words, of sec. 49 of Art. 3 of the Constitution. But he denounced as the most obnoxious provision of the Act, that which declares the Commissioners to be the *agents* of the city, capable, as such agents, of imposing upon the city a legal responsibility, as well for their acts of *commission* as for their acts of *omission*. In the common case of the relation of principal and agent, the former has the right of selection. But here *the State* selects the Commissioners, and, by mere arbitrary power, against the will of *the city*, puts them in authority, and denudes those whom the city had selected, of all power to act. Is this a proper case for the doctrine of *respondeat superior?* If any judge in the land, in the case of a private person, should so decide, he would be impeached for the act. And why is not such a provision equally as tyranical and unjust in the case of a municipal corporation as in the case of a natural person? Why should it not be denounced in a *legislative enactment*, just as readily as in the supposed case of a *judicial decision?* He insisted that the law of the land, the Bill of Rights, the Constitution of the State, all forbid what he characterized as an outrage on sacred rights. He further insisted that even if no express provision can be found in the Constitution, there exists in the social compact, expressed or unexpressed, a *higher* law, which controls and nullifies all legislation which is palpably against

the principles of natural justice. The phrase may have be=
come exceptionable from modern misapplication; but, pro-
perly applied, it indicates that paramount law which is above
all merely human law. It is that sense of justice and right
which God himself has impressed on the heart of man. It is
that universal, unchangeable law, of which Cicero spoke—
"Not one thing at Rome, another thing at Athens, one thing
to-day, another thing to-morrow, but in every age, and amongst
all nations, one and the same, immutable and eternal." It
is that law of which Bishop Hooker said: "I bow with rev-
erence before the majesty of the law. Her seat is the bosom
of God; her voice the harmony of the world. All things in
heaven and on earth do her homage; the very least, as feeling
her protection; the greatest, as not above her power." Lord
Coke asserted it in *Bonham's Case,* 8 *Coke,* 118; Chief Jus-
tice Hobart in *Day vs. Savadge, Hob.,* 87, and Lord Holt in
the case of the *City of London vs. Wood,* 12 *Mod.,* 687.
And this is not a new doctrine in Maryland. It was clearly
and beautifully maintained by one now no more, (a great
judge and a noble gentleman,) in the case of *The Regents of
the University of Maryland vs. Williams,* 9 *G. & J.,* 408;
He read the following sentence from the opinion of Chief
Justice Buchanan in that case: "Independent of any express
restriction in the Constitution of the State, there is a funda-
mental principle of right and justice, inherent in the nature
and spirit of the social compact, (in this country, at least,) in
the character and genius of our government, in the causes
from which they sprang, and in the purposes for which they
were established, that rises above and restrains, and sets bounds
to the power of legislation, which the Legislature cannot pass
without exceeding its rightful authority. It is that principle
which protects the life, liberty and property of the citizen
from violation in the unjust exercise of legislative powers."

4th. In discussing his fourth proposition, he admitted that
the Legislature had large powers, but when restrained by the
Constitution, they are under a paramount law. In com-
menting on Art. 2 of the Bill of Rights, (in which it is
said that *the people* of the State ought to have the sole right

of regulating the internal government and police thereof,) he insisted that it properly expressed that the sovereign power was not in the *Legislature* but in the *people.* They have spoken in the Constitution, and in so far as they have by that instrument committed to any *other* authority than the Legis-lature, any *police* power, to that extent has the Constitution inhibited to the Legislature the exercise of police power. He referred to the *addendum* to sec. 19 of Art. 4, which is in the following words: "And the Mayor and City Council may provide by ordinance, from time to time, for the creation and government of such temporary additional police as they may deem necessary to preserve the public peace," and he insisted that whatever power is given by this constitutional provision to the city government, is forbidden to the Legislature. His argument was as follows: By the body of sec. 19 of Art. 4, a *State* police is provided for the election districts of every county, and for every ward in the city of Baltimore. He de-nominated this as the *permanent* police. The only power conferred on the Legislature, as respects this permanent po-lice, is the power to increase or diminish the number, to de-fine their duties and fix their compensation. The mode of their selection, and their tenure of office, are fixed by the Con-stitution. By Art. 7, sec. 9, power is conferred on the Leg-islature to provide for the appointment of *other* county officers for *the counties* of the State, but no provision of like charac-ter, in relation to the city of Baltimore, is found in the Con-stitution. The reason is obvious. By the *addendum* to sec. 19, the power, as respects the city of Baltimore, was conferred on the municipal government. If this is not the true expla-nation, how is it to be accounted for, that whilst the Conven-tion, with anxious solicitude, made provision for unforeseen emergencies, which might require additional officers for *the counties,* no such provision is made for the great commercial mart of the State, with a population of a quarter of a million of people, and paying more than half the State revenue, be-sides defraying the expenses of her local government?

In commenting further on this *addendum* to sec. 19, he said that the word "may," as there used, means "must."

He cited 1 *Pet.*, 64, 2 *Chitty's Rep.*, 609; 9 *Md. Rep.*, 174, and *Dwarris on Statutes*, 712. The word, "provide," does not mean, as argued, to raise a force for the purpose of putting down an *actual open riot*. So, "to preserve the public peace," does not mean to *restore* it. It plainly means that in order to *prevent* any breach of the peace, such additional police shall be provided by the city government as, in their judgment, may be deemed necessary for the purpose. This body is to be created, not *by Act of Assembly*, but by *Ordinance* of the city government. This police force is essentially an internal, local, urban institution, and is, therefore, properly placed under the government of the Mayor and City Council. The city very judiciously and properly exercised the power conferred on them by the Constitution, in the ordinance of the 1st of January, 1857. It is an error to say that this ordinance was passed in virtue of the Act of 1853. It does not profess to have been so passed; and it is a fact conceded, that the Ordinance passed by councils of that day, pursuant to the Act of 1853, was not approved by the then Mayor, and never became a law. He said the Act of 1853 may have been passed from abundant caution, to remove some doubt as to the constitutional power of the city to *arm* the local police. Or, as it was the duty of the city to maintain an adequate police, the Legislature may have justly supposed that it had the right to *require* them to do so. The present Act *takes away* the power from the city. He denied that the word "*additional*," in said sec. 19, referred to the Act of 1812. It referred to the permanent police. But even if it did refer to said Act, the repeal of that Act did not annihilate the power conferred on the city by the Constitution. It is not a mere accessorial right. It is a substantive power, not derived from the Legislature, not subject to the will of that body, but an independent municipal power, which the city government, alone, has the right to exercise, and is bound to exercise, to preserve the publice peace within the territorial limits of the city.

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

Tuck, J., delivered the opinion of this court:

Whether the present case possesses an unusual degree of importance, in view of the circumstances which, it is said, rendered necessary the passage of the law under review, or of the supposed difficulties which may attend its practical operation, if the judgment below be affirmed, is a question with which the court has no concern. It involves considerations of expediency and public policy of which the Legislature was the exclusive judge, and which, we must assume, were fully weighed and determined when the Act was passed.

In another aspect, however, its consequence has not been undervalued by the counsel, nor overlooked by the court, while calmly considering the arguments adduced in support of their respective views of the Constitution and theory of government under which we live. When this department is called upon to review the acts of a co-ordinate branch of the government—the members of both having entered upon the discharge of official duties under the same solemn sanctions, and with a like sense of responsibility—we cannot fail to realize that the matter is of the gravest character, and de-mands our most careful and dispassionate consideration. In such cases there is no conflict between the Legislature and the Judiciary; on the contrary, it is to prevent strife and possible collision among those on whom the legislation is to operate, that we are made the final arbiter between them; the spirit of our institutions. inculcating and exacting obedience to the laws as announced by the appropriate tribunals. And although, when the court is satisfied that the Legislature has exceeded its authority, we would no more falter in denouncing the Act as void, than we should hesitate in deciding the most unimportant matter within our jurisdiction, yet, in cases of doubt on the question of power, it would be improper to interfere. We could not do so without assuming (when it did not clearly appear) that the Constitution had been vio-lated, which should not be predicated of another department in the discharge of functions peculiarly its own, as the law-making power. This. is the settled doctrine in this State, and, as far as we. are. informed, in every case in which the

question has been considered. *Regents vs. Williams,* 9 *G. & J.*, 365. *State, use of Washington County vs. Balto. & Ohio Rail Road Co.,* 12 *G. & J.*, 399.

The Mayor and City Council of Baltimore, a public corporation, charged with extensivᵉ franchises for municipal purposes, had, for many years prior to the adoption of the present Constitution, an organized police force for the protection of the city, which had been, from time to time, increased in number, and the regulation thereof changed as the wants of the people seemed to require. It is not necessary to specify these changes, or refer to the Acts of Assembly authorizing them; let it suffice that the validity of the laws was never questioned, nor the ordinances of the city, on that behalf, considered as beyond the limits of its charter. Whatever may now be thought of the effect of the Constitution upon the charter-privileges of the corporation, it is not to be doubted that the Legislature considered the city as remaining subordinate to the power of the State, according to the general doctrines applicable to public corporations, (9 *G. & J.*, 397, 401; 9 *Cranch*, 52; 12 *G. & J.*, 439, 440,) for at the session of 1853, ch. 46, the Legislature passed "An Act to provide for the better security of life and property in the city of Baltimore, by increasing and arming the police force thereof," whereby the Mayor and City Councils were authorized to increase and strengthen the police, to arm and pay them, and to indemnify them, when injured in the performance of their duty; and we find that, in 1856, an Ordinance was passed, "To establish a police for the city of Baltimore," which was approved 1st of January 1857, and afterwards again approved among the Revised Ordinances of 1858, (No. 30.) This Ordinance having abolished the old police system, the one therein prescribed took effect on the 1st of March 1857, and remained in operation until the session of 1860, when the Legislature passed the Act now under consideration, whereby all former laws and ordinances in relation to the police of the city were repealed, and a different system established, the details of which are set forth in the law, and to carry them out Commissioners were named in the Act, and every power

DECEMBER TERM, 1859.                                 455

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

deemed to be necessary to that end conferred upon them. This law deprives the city authorities of all control over, or interference with, the police of the city, except as provided by the 19th sec. of the 4th Art. of the Constitution, and they, having denied the validity of the law, and refused compliance with its terms for the purpose of having that question determined, the duty devolves on us of deciding whether it is a legitimate exercise of legislative power.

At the very threshold the relators are met with the objection that the law is radically void, because the Legislature had no power to appoint the Commissioners in the Act. It is plain that this point, if well taken, strikes down the law at one blow, because, if not validly appointed, they cannot proceed to put it in force, and all other instrumentalities must fail. But if the Legislature had power to make the appointment, we cannot say that it ought not to have been exercised, any more than we could, with propriety, pass upon the correctness of its judgment in selecting these officers. It is a mere question of legislative power, and as such, alone, can we treat it.

It is contended that, the power of appointment being an intrinsic executive function, the naming of the Commissioners in the law was in violation of the 6th Art. of the Declaration of Rights, "That the legislative, executive and judicial powers of government, ought to be forever separate and distinct from each other, and no person exercising the functions of one of said departments shall assume or discharge the duties of any other."

We are not prepared to admit that the power of appointment to office is a function intrinsically executive, in the sense in which we understand the position to have been taken; namely, that it is inherent in, and necessarily belongs to, the executive department. Under some forms of government it may be so regarded, but the reason does not apply to our system of checks and balances in the distribution of powers, where the people are the source and fountain of government, exerting their will after the manner, and by instrumentalities, specially provided in the Constitution. The case cited, (3

*J. J. Marshall*, 401,) affirms that it is intrinsically executive; but the judge explains that the. *nature* of the *power* is executive, whether exercised by the Governor, or a court, as distinguished from those acts of the court that are merely judicial.   But it is no where intimated that another department, than the executive, cannot exercise the power.   On the contrary the case was disposed of on the ground, that the court had the power to appoint the clerk, and that its judgment could not be interfered with, by way of appeal from the order of appointment.   And, indeed, here it is admitted, that the executive cannot act where other modes of appointment are prescribed by the 'Constitution.   It is true that certain powers are peculiar to each department, as their designations import (2 *Md. Rep.*, 452) the Legislature makes the laws, the Judiciary expounds them, and the Governor sees that they are faithfully executed; but even in this duty he is restrained in some degree, because they must be enforced according to the Constitution and laws, and not at his will and discretion.   It does not follow, as a necessary conclusion, that, in order to perform this duty, he must have agents of his own nomination.   Our form of government, in its various changes, has never recognized this power as an executive prerogative.   Under the Constitution of 1776, although appointments were generally made by the Governor and Council, some of the most important were not.      Registers of Wills were commissioned by the Governor, on the joint recommendation of the Senate and House of Delegates, the power of the Governor and Council to make an appointment being limited to vacancies during the recess of the Legislature, and then to continue only until its next meeting.   So the clerks of courts were appointed by the judges, the power of the executive being restricted to cases of vacancy, and until the meeting of the court.   This, however, was changed by the amended Constitution of 1836, which conferred the power of appointment on the Governor—by the advice and consent of the Senate, a branch of the Legislature, yet *pro hac vice* discharging executive duties.   If we look to the present Constitution we find a similar state of things.   The clerks and registers

and other officers are elected by the people, but, when vacancies occur, the office is not in all cases, though in some, filled by the executive.     In such emergency, the clerks and State's attorneys are appointed by the court; the Register of Wills by the Orphans courts; constables by the county commissioners, &c., &c.; and as to the clerk of the Court of Appeals, the executive department has no power whatever, the appointment residing with the judges.     Under the old Constitution, the Treasurer and Commissioner of Loans were appointed by the House of Delegates, the Governor's power extending only to cases of vacancy, and under the present the Treasurer as well as the Librarian receive their appointments from the Legislature.    These instances are sufficient to show that the Constitution, so far from treating this as an inherent executive power, indicates that it belongs where the people choose to place it.

But this Article is not to be interpreted as enjoining a complete separation between these several departments.     Practically it has never been so in any of the States in whose fundamental law the principle has been asserted.     There are numerous instances to show that it has not been so regarded in this State for our statute books contain, time and again, laws affording relief where the judiciary possessed ample jurisdiction over the subject-matter.   How this kind of legislation came to be introduced, it is useless now to inquire.  It was commenced soon after the adoption of the Constitution, probably participated in by some of the framers of that instrument, and has been continued ever since; and we know that valuable estates are now enjoyed upon no higher title than such Acts of Assembly, operating as judicial decrees.   Instances of appointments by the Legislature are equally, if not more numerous.   Many were cited in argument, and some of them in regard to matters of vital importance to the citizen, especially those relating to the city of Baltimore.    It may be, as suggested in argument, that the persons named in these laws were not regarded as officers, in the meaning of the Constitution; but does it follow that these Commissioners are within the class contemplated by the Constitution?   We

do not mean to say that the Constitution, in its prohibitions, operates only on offices known to the Constitution, and does not extend to those created by law, though an opinion to that effect, by one of the most eminent jurists of his time, (*Wm. Pinckney*,) is on file in the State Department, and for many years furnished authority for appointments that seemed to have been prohibited by the Constitution. We allude to this legislation as evidence of cotemporaneous construction, and acquiescence by the people, and the various departments of the government, in such practical interpretation. For the effect of such continued practice, see *Burgess vs. Pue*, 2 *Gill*, 11; *State vs. Mayhew*, 2 *Gill*, 487. It is true that it was intimated, rather than decided, in 9 *G. & J.*, 416, that an unconstitutional Act of Assembly, affecting a private corporation, cannot be made valid by acquiescence in it; but the same court had held in *Shafer vs. Stonebraker*, 4 *G. & J.*, 345, that the practice of sustaining special demurrers had engrafted upon the Act of 1763, ch. 23, an interpretation that nothing but an Act of Assembly could change. The same doctrine was announced in *M'Colloch vs. The State*, 4 *Wheat.*, 316. See, also, *Bradford vs. Jones*, 1 *Md. Rep.*, 351, that the Constitution may receive an interpretation from a long, constant, and uniform legislative practice. There are also instances in which the common opinion of the profession, and the forms and course of judicial procedure have been regarded as safe guides in the adjudication of points of law; see 5 *Md. Rep.*, 271. 6 *Md. Rep.*, 317. 7 *Md. Rep.*, 442. 1 *G. & J.*, 231; and 2 *G. & J.*, 285. Is it not as important, that the interpretation of the fundamental law should be as uniform and certain as that of legislative enactments? In both, the intent of the authors is the point to be arrived at, and the same rules and means of ascertaining it may be resorted to. If such considerations do not establish the right of the Legislature to make appointments of this kind, they are well calculated to raise very serious doubts on the subject, in which state of the judicial mind the law must be left to operate, until changed by the proper branch of government.

In considering the question as to the separation of the departments, we are to bear in mind that the Declaration of Rights is not to be construed by itself, according to its literal meaning; it and the Constitution compose our form of government, and they must be interpreted as one instrument.   1 *G. & J.*, 472.   The former announces principles on which the government, about to be established, will be based.   If they differ, the Constitution must be taken as a limitation or qualification of the general principle previously declared, according to the subject and the language employed.   In our government there are several instances of this kind, in reference to this 6th Article.   The Constitution of 1776, contained the first portion of the Article in our present Constitution, yet it devolved on the Legislature the election of the Governor and Council, and on the Executive the appointment of judges, and, in certain contingencies, of officers connected with the judiciary.   It also provides for the appointment of other officers, and, accordingly, judges of the orphans court, from 1798 to 1851, were appointed by the Executive.   So, also, that instrument, as does the present Constitution, invested the Legislature with *quasi* judicial functions, in exercising the power of impeachment and punishment, as therein provided.   A similar departure is observable in the union of the Senate and the Governor, in making appointments to office.   It is obvious that dangerous combinations might be formed between these branches of government, yet such a possibility did not outweigh the necessity of providing checks upon the improper exercise of the appointing power if left in the hands of the Governor alone. Hence a portion of the Legislature was made, as it were, a part of the executive power in the State.

The words of the Article appear to be plain enough, but they have not been accepted in their literal sense.   As we have said before, entire practical separation was not designed; without recourse to cotemporaneous writers of high authority, we may content ourselves with the exposition of the Court of Appeals in *Crane vs. Meginnis*, 1 *G. & J.*, 476, to the effect, that it was designed to ingraft this principle on our

system, "only as far as comported with free government," as "an inhibition upon the exercise by one department of powers conferred on any other by the Constitution; restraining each branch within its appropriate sphere, by forbidding to it the use of powers allotted to the co-ordinate departments." In that case a portion of the law was declared void, as an exercise of judicial power in its passage. If the power exercised by the Legislature, in the case at bar, had been conferred on any other branch of government, a like result would follow; but if the power is given to the Legislature, it may be exercised notwithstanding the 6th Article of the Declaration of Rights; which brings us to consider the 11th sec. of the 2nd Article of the Constitution.

On this Article the relators insist, that it authorizes the appointment by the Legislature, because it confers on the executive the appointment of all officers, not otherwise provided for, "unless a different mode of appointment be prescribed by the law creating the office," and that, as the law in question creates the office, the designation of the Commissioners in the Act is within the intent and meaning of the Constitution; to which it is answered on the part of the respondents, that this section, gives the Legislature, in creating an office, power only to prescribe the mode of appointment, and can by no legitimate rule of construction be interpreted to grant the power of legislative appointment. It is conceded that the Legislature was not under any obligation to confer the power of appointment on the executive; by this clause of the Constitution the power was placed there, in the event of a different mode not being prescribed in the law. But, it is said, it ought to have been delegated to the people or local authorities of the city of Baltimore. In the absence of any such requirement of the Legislature, we do not perceive that they were under a duty to make such delegation of the appointing power. The Constitution surely designed to repose some discretion in the Legislature, both over the mode of appointment, and the propriety and necessity of passing any law on the subject to which the exercise of the power might relate. It seems difficult to suppose that the people, through

the Constitution, would entrust to that branch of government, nearest to the source of power, the right to create an office, and to indicate others to appoint the officers, and be unwilling to place the appointment with the Legislature itself.    The Constitution must receive an interpretation according to the sense in which the people are supposed to have understood its language; but it ought, also, to be construed with reference to the previous legislation of the State.    2 *G. & J.,* 285. And when such power had been exercised by the Legislature, from the earliest period of the government, is it unreasonable to suppose that the people were aware, that the same might occur again unless prohibited by the Constitution?  If there is no prohibition, express or implied, it would result from.this view. that the people intended the Legislature should continue to exercise the power.   We are not dealing with one or a few words to extract what the instrument means; we look to the whole, its provisions, grants, restrictions, objects and purposes, and endeavor, from the whole, to give it such effect as we think the framers and the people designed.   We are not to be. considered as advocating the exercise of such powers; in exciting party times it might effect much mischief; but not more than the mere passage of laws, where the Legislature and executive are of the same political complexion.   Yet no one doubts the power of the Legislature to enact laws, when it is believed that mere political purposes are to be accomplished.    In such cases, however the people may complain, they submit until a change of the Legislature can be effected in the constitutional mode.    Hence we see that while the motives of the Legislature can have no effect upon the efficiency of the laws, neither can they be regarded by the judiciary when testing their power to pass them.

We have considered this point at some length, because it was greatly pressed by counsel, although we think that the objection is fully met by the case of *Davis vs. State,* 7 *Md. Rep.,* 151, on which the learned judge below founded his decision of it.

Pursuing the arrangement suggested by the brief of the appellants, we are next to consider the effect of the fourteenth.

section of the law, which transfers the existing police force of
the city from the city government to the Commissioners.
This is said to be unconstitutional, and, if so, the objection
defeats the law.   The arguments submitted on this part of
the case are of the gravest character.   The appellants claim
for the city a dignity far higher than belongs to any other
portion of the community; a character that raises it above the
power of the State, except such as is reserved by the Consti-
tution itself; and that the charter is a constitutional charter,
placed beyond the reach of mere legislative power, either to
repeal it, or to annul or destroy its important franchises.

That the city has certain rights, under the Constitution,
none will deny, but so have the counties.   Each is a public
territorial division of the State, established for public political
purposes connected with the administration of the govern-
ment, possessing the character, and endowed with the pow-
ers of, corporations, according to the laws severally appli-
cable to them.   12 G. & J., 399.   They are mere instru-
ments of government, appointed to aid in the administration
of public affairs, and are parts of the State.   As public cor-
porations, they are to be governed according to the laws of
the land, and are subject to the control of the Legislature.
Regents' Case, 9 Gill & Johns., 397, 401.   12 G. & J., 439.
This is the unquestioned doctrine on the subject, apart from
the supposed effect of the Constitution on this particular char-
ter.   We have no idea that the Convention, or the people, de-
signed to clothe the city with the immunities now claimed
for it.   That they would have placed a large city, with a
population equal to nearly one-half the State, beyond the
operation of its laws, and above the power of the people them-
selves, in the exercise of their sovereign right to govern the
State, is not to be believed, and unless it plainly appears that
such an *imperium in imperio* is created by the Constitution,
the pretension ought not to be allowed.   The considerations
that suggest themselves in opposition to it, are so obvious, that
they need not be dwelt upon.   Nor do we believe that the
exemption has ever before been claimed.   The city was char-
tered by the Act of 1796, ch. 68, with powers fully equal to

the wants of the people, as was supposed at the time. Its police powers are set forth in the *ninth* section. The next year, (1797, ch. 54,) a supplement was passed, giving additional powers, and declaring that the original charter and that supplement should be perpetual, and that all ordinances passed, or to be passed, should be valid. To be sure, this was not a constitutional recognition of the city, but, as far as one Legislature could bind its successors, all power over the corporation was parted with. But we know that numerous Acts were passed afterwards, materially affecting the rights and powers of the corporation; some at the instance of the people, but others without such application, as far as the Acts themselves afford any information as to the motive of their passage. As a signal instance, we may notice the Act of 1817, ch. 148, "relating to the city of Baltimore," wherein, in addition to important provisions concerning the government of the city, and the powers of the Mayor and City Council, and although they had ample jurisdiction over the subject of streets, Commissioners were appointed, *by name in the law,* to survey and lay off the city into such streets, lanes and alleys, as they might deem expedient, with power, also, to select and purchase property for public purposes, the city authorities having no voice in the matter, except as to the reasonableness of the price, and all expenses contracted by them were to be paid by the city. And although the city charter was recognized by the amended Constitution of 1836, as fully, in our opinion, as under the present, (we speak apart from the 19th sec. of the 4th Art.,) with all the powers before possessed by the corporate authorities, it was deemed necessary, or advisable, to obtain, by the Act of 1838, ch. 208, authority to increase the annual levy to $350,000, and, by ch. 226 of the same session, further power in reference to streets. And, on examination of the laws, it will appear that most of the subjects over which jurisdiction is now given to the Commissioners by the Act of 1860, were legislated upon by the State, or by the Mayor and City Councils under authority of the State Legislature. During the time elapsed since the adoption of the present Constitution, similar powers have been fre-

464 MARYLAND REPORTS.

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

quently exercised. It is unreasonable, in the nature of things, that a portion or political division of a State should be above the power of the whole, and we cannot find in the Constitution any warrant for the opinion that the people intended to give to Baltimore City such pre-eminence.

If there be any inherent rights or franchises under the charter of the city, we think they need not be passed upon now, because they are not assailed or proposed to be taken away by the law in question. The object is to regulate the police affairs of the city, not to destroy its franchises; to place these matters in other hands, whereby the duty of governing, always residing in the State, is to be discharged by means of other agencies than those heretofore employed. Ascribing to the Legislature the motives with which all laws of this kind are supposed to be passed, we must assume that the object is to accomplish, for the good of the citizens of Baltimore, that, in respect to which, previous legislation had failed of adequate results.

The third point on the brief relates to the 12th section, which transfers the use of the Fire Alarm Telegraph, station houses, &c., to the Commissioners.

We are of opinion that the argument on this branch of the case was based on the inaccurate idea, that this is private property within the meaning of the Constitution. There is no doubt that taking private property is beyond the scope of legislative authority, except when required for public use, and upon just compensation being made. But does this property come within such description? Let us test this by the very exception stated in the argument. If private, the State may take it for public use, on making compensation. But to whom is the compensation to be made? Not to the Mayor and City Council, as individuals; but to them as representing the people. And how made? By a tax levied upon the people themselves. That is, the people are to be taxed to buy property from themselves, for which they have already been taxed and have paid. City property may be taken for public purposes other than the uses of the city; that is, we suppose, that property owned by the city might be condemned, in

some instances, as any other property; but then the use would pass from the city into other hands, from whom the payment or compensation would be made to the city as recent owner; but this doctrine cannot apply where the design is merely to take city property dedicated to particular uses, and apply the same property to the same purposes, by only changing the agency by which the use is to be directed. The use is the same, and the character of the property is not changed, nor the title, because, no matter by whom managed, it remains public; devoted to public use, and all the while belongs, not to the Commissioners, but to the city.

The 4th, 5th and 6th points relate to the 19th sec. of the 4th Art. of the Constitution. The solution of the questions arising on them depends on whether the police which the city authorities are empowered to create, is to be additional to the conservators of the peace; mentioned in the section—that is, the justices of the peace and constables—or to the general police system then in operation, and such as might thereafter be established by law.

This section, whether considered alone or together with other portions of the Constitution which appear to have reference to the same subject, is by no means free from difficulty. Urged as they were, either theory appeared to be so well supported by argument and illustration, as almost to challenge our acceptance; but, on carefully considering the subject in all the phases in which it was presented, we have arrived at the conclusion that the respondents' construction ought not to prevail, as well for reasons affecting and vital to the supreme power in the State, as on account of the city of Baltimore, in emergencies where her citizens might suffer more from the want of power in the State authorities, than from possible abuse in the exercise of it. If the case were clear upon the words of the Constitution, or by necessary implication, we could not give weight to such considerations, but on a question where the human reason may pause and the judgment be suspended, on account of uncertainty in the language employed, they ought not to be overlooked.

It is a matter of very serious doubt with us whether, if the

respondents' view be adopted, the city of Baltimore could have any other than a peace-police, as distinguished from such other police regulations as are conferred on the Commissioners. It is not made the duty, nor is it within the nature of his office, that a justice of the peace, or constable, should perform police duty, other than such as looks to the preservation of the peace. They have no jurisdiction over most of the subjects mentioned in the fifth section of this law, of as much importance and as necessary to the well being of the inhabitants of a large city, as any other we can imagine. If the police power is exhausted, if the whole ground is covered by this clause of the Constitution, to the exclusion of legislative power, we are at a loss to perceive where the city will find authority to pass any police ordinances other than such as are merely temporary and additional to justices of the peace and constables, who, as we have said, are merely peace officers. But, by construing the power as remaining with the Legislature, it, or the the city authorities, may exercise these necessary functions of government for the benefit of the city, as may be provided by law. We have the highest authority for saying, that the power to govern belongs to the people. (*Dec. of Rights.*) It is their duty to exercise it for the common good, and being under that obligation, it is not to be assumed that they have impaired the means of performing the duty by parting with the power to any division of the body politic. 4 *Peters,* 514. 11 *Peters,* 547.

It is no valid objection to the existence of the power, that it is in some degree concurrent in another organization in the government, and that the exercise by both may lead to confusion and possible strife. How far the city may proceed under this clause of the Constitution, we will not decide in anticipation. It will be quite time enough to determine the limits of power between the Commissioners and the city authorities, when the case is presented. But are we to assume, that the people will not acquiesce in the proceedings of the Commissioners? They are not appointed to act for themselves, or for any portion of the citizens, adversely to the rest; on the contrary, their duties are to be performed for the

DECEMBER TERM, 1859.          467

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

good of the whole. This must be predicated of all laws, and of the officers appointed to execute them. The present is a case between the State and the city, to determine the particular matters before us, and we must presume, that, when the question is settled, each will move in its allotted sphere in harmony with the other, else why is it made our duty to decide between them? The effects of the interpretation contended for, by the appellants, are further stated and considered by the Chief Justice in his opinion, and we need not pursue the point further, than to say, that the law, so far from designing any interference with the powers of the city, under this clause, in express terms recognizes its authority. Sec. 15.

The objection urged against the 15th section, under the 7th and 8th points, we think, cannot be sustained. The power to levy taxes is a sovereign power, and unless committed to some portion of the people, may always be exercised by the Legislature. It is not to be considered as parted with by mere construction, and we have not been referred to any portion of the Constitution which divests it. Is it contended that the Legislature cannot lay a tax, without the consent of the particular people who are to pay it? We suppose not. When the Legislature provides for a tax, by any agency whatever, it is, in contemplation of the Constitution, the act of the people, and binding on all alike. Of such legislation it cannot be averred, that it is against the principles of free government. There may be such an exercise of the power that judges might not have voted for the law, but that does not affect the right to pass it. Under the old system of levy courts, and tax commissioners, when appointed by the executive, it was never said that they had not power to make assessments and levy taxes. They were not elected by the people, nor accountable to them. They were appointed, under legislative authority, by the executive, and the State exercised its supreme power of taxing the people through their agency. So here, the State chooses to substitute Commissioners in the place of the city authorities for the purpose of levying this tax, and we see no sufficient reason,

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

for denouncing the law on that account. That such a power may be delegated, see *Burgess vs. Pue*, 2 *Gill*, 11.

It is not deemed necessary in the present case to decide, whether the fifteenth section authorizes the Commissioners to put the certificates of debt, that they may issue, in the market, and sell them under par, nor the effect of such disposal of them.    When the question is presented under proper judicial proceedings, the courts can determine how far the clause in the Constitution, on the subject of usury, may affect the validity of the demand.    Besides, if there be any thing in the objection, it might apply as well to other evidences of debt issued by the city, and we are not disposed to prejudge the matter in advance of the defence being taken by those who, alone, can interpose it, and in a particular form.

There is no injustice nor defect of law in authorizing them to be received in payment of taxes. No person can be compelled to take them, and if taken and set-off against a claim for taxes, it will be only following a mode of payment heretofore practiced, when coupons were made receivable in payment of public taxes, to which no objection was ever raised.

The supposed improper interference with the duties of the sheriff, as urged against the 13th sec., would not vitiate the law, if the point were sustained; nor that in relation to the power of the Commissioners to call out the military authority of the State.    1 *G. & J.*, 463.    The views presented in the opinion of the Chief Justice, as well as that of the court below, show that these objections are not well taken.

That portion of the sixth section which relates to Black Republicans, &c., is obnoxious to the objection urged against it, if we are to consider that class of persons as proscribed on account of their political or religious opinions.    But we cannot understand, officially, who are meant to be affected by the proviso, and, therefore, cannot express a judicial opinion on the question.    As to the effect of the clause in the 16th sec., which disqualifies from holding any office under the Mayor, &c., such persons as shall forcibly resist the provisions of the law, the judges are equally divided in opinion.

The argument as to the 19th section, concerned more the

DECEMBER TERM, 1859.    469

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

apparent harshness of the measure, than the power of the State to make these Commissioners part of the city authorities, for whose acts the latter is made responsible.    What we have said in reference to the former Commissioners of Tax and Levy courts, will apply here.    The counties were chargable as fully as now for the conduct of these local authorities, yet they were not of the people's own selection.    They were appointed by the executive from among the citizens of the county, as these Commissioners are from among the citizens of Baltimore, and, if the State thinks it expedient to select such agents to execute municipal laws, there is no less ground for holding the people responsible than if they were otherwise appointed, whatever reasons might be urged against the execution of State authority in that way.    If the argument should prevail, it would not defeat the law, and whether a party complaining of default on the part of the officers provided for by the law, can hold the city liable, may be better determined when such a demand shall be preferred.

Among the arguments against this law, it was contended that, apart from the Constitution, its provisions are so arbitrary, and unjust, and subversive of liberty, that the court ought to declare it void; and in support of this view, reference was made to that part of the opinion in the *Regents' Case*, 9 *G. & J.*, 408, where it is said, that there is a fundamental principle of right and justice inherent in the nature and spirit of the social compact, that rises above and restrains the power of legislation, which the Legislature cannot pass without exceeding its rightful authority.    We need not examine this principle, if we see that it can have no application to the case before us.    The court were dealing with the rights of a private corporation; we are treating of a public municipal corporation, and with the limitation of the principle as announced by the court, that it was designed to protect the life, liberty and property of the citizen from violation in the unjust exercise of legislative power, we are prepared to affirm that it asserts a very correct doctrine.    But we do not understand that case as having applied the principle

to the Legislature, when exercising its sovereignty over public charters granted for purposes of government.

The case has been most carefully prepared and elaborately argued, indicating great zeal and sincerity on the part of counsel. We have as carefully and anxiously considered their arguments, and the doctrines on which we supposed the case ought to be decided, and having here presented the convictions of our best judgment upon them, we conclude with the additional remark, that we are not to be considered as dissenting from the views of the court below, where they have not been specially referred to and adopted. Inasmuch as the cause is of great importance, we deemed it due to the occasion to enter more fully into the various questions argued before us, than, under other circumstances, we might have felt ourselves required to have done, and chiefly upon those points which are not as fully discussed in his opinion.

The result is, that the order granting the *mandamus* must be affirmed.

<div align="right">

*Order affirmed.*

</div>

LE GRAND, C. J., delivered the following separate concuring opinion :

The questions which this court is called upon to decide on this appeal, grow out of a portion of the enactments of the Legislature at its last session, and particularly the Act generally known as the Baltimore Police Bill.

Alternately this Act has been criticised and defended at the bar, and always with zeal and ability, according to the peculiar views in regard to it, of the eminent counsel who have considered its provisions, and who have pointed out, agreeably to their respective opinions, its repugnancy to, or harmony with, the language and spirit of the Constitution of the State. If the consciousness of official obligation, and the intrinsic importance of the inquiries involved, did not demand it, the earnestness and the confidence in their solidity, with which the arguments of experienced and well-informed jurists have been addressed to this tribunal, would be sufficient

to challenge all the patience of examination and dispassionate reflection of which it is capable.

The questions to be determined, if not novel in the history of our jurisprudence, are, nevertheless, of large magnitude. Apart from their purely legal nature, they are supposed to in-clude matters, the particular settlement of which will ascertain, in the future, the ascendency of some one of the divisions into which the people of the city of Baltimore are politically classified. It is not improbable that, to this circumstance, a considerable part of the interest with which the discussion has been invested, owes its origin.

The popular mind very naturally views a subject of this and the like character, in the same light as it would one to be passed upon by it at the polls in the exercise of the elective franchise, coloring the expression of its opinion with the complexion of the dogmas to which it has been accus-tomed to give its allegiance and support. And it requires neither an extensive experience or observation to satisfy any one that, under the influence of such feelings, the citizen has not been unfrequently found at one time sanctioning or op-posing a particular measure, when, after it has been put in operation, his opinions have undergone a radical and thorough change as to its propriety and usefulness. But, whatever may be with him the controlling impulse to action, in any particular case, with a judicial tribunal no such rule can be observed without a palpable departure from the obvious path of duty. With the convictions or prejudices of the commu-nity, however sincerely entertained, or worthy of respect, *un-less they be sustained by the law*, which it is its sworn obliga-tion to uphold, a court of justice cannot concern itself to give to them practical vitality and enforcement.

The Constitution and laws fix the boundaries within which their ministers must act. All action outside is forbidden as usurpation, and, therefore, tyranny. In all governments, having any just pretensions to be considered free, limits are established to authority, of whatever character it may be. "There can be no liberty," says Montesquieu, "where the legislative and executive powers are united in the same per-

son or body of magistrates," or, "if the power of judging be not separated from the legislative and executive powers." The meaning of this, says Mr. Madison, is not that "these departments ought to have no *partial* agency, or no *control* over the acts of each other," but amounts to this: "That where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free Constitution are subverted." But of this more hereafter. Suffice it for the present, that in the true sense of Montesquieu, in this, as in each of the other States of the confederacy, the powers of government have been parcelled out to be exerted by separate and distinct departments. It is for the Legislature to enact, the judiciary to expound, and the executive to enforce laws. Neither of the departments is absolutely sovereign in all things, but is only so within its proper limits. According to the theory on which our State government is founded, the people are recognized as the source of all governmental power. They are, in this sense, the true and only sovereigns. For their own good, they have authorized a body, chosen by themselves, to exercise, under certain prescribed limitations, the supreme power. This body is known, in common parlance, as the Legislature, and, except in cases prohibited, either by the Constitution of the United States or that of the State, is as free and competent to act in the passage of binding and effective laws as would be the people themselves, if they were acting in their primary and sovereign capacity as a pure democracy; restrained only by their sense of justice and expediency.

The difference between our State government and a pure democracy, consists in this: In the latter, the people have the power to do as they may please, while in the former, their delegates have the same scope of authority, save in so far as there be *express* or necessarily *implied* limitations on it. Without these limitations their power is absolute. This definition is nowhere denied by persons familiar with the nature of our political institutions, and has been affirmed by the courts of every State in the Union, whenever they have been called

Mayor, &c., of Balto. *vs.* State, *ex rel.* of the Board of Police of Balto.

upon to pronounce in regard to it. It would be a needless labor to enumerate the cases in which there has been a palpable recognition of it. It was distinctly recognized in the very able and lucid argument addressed to this court by Mr. Alexander, one of the counsel for the respondents, in the following apt language: "I agree," said he, "that in the absence of constitutional limitation, the legislative power extends to all appropriate subjects of legislation; that the limitation is the exception, and that he who would insist upon the limitation, must prove it. But it is not at all necessary that the limitation should be created by express words; it may be made out by implication, resulting from the grant of power to another department, and even by the form in which power is granted to the Legislature."

This being so, the question then arises, whether there be anything in the law now under review which is in conflict with the provisions of either the Constitution of the United States or of that of the State of Maryland? And this question is purely one as to the power residing in the Legislature to pass it. It does not touch the *expediency* or *utility* of the enactment. These were matters for the *exclusive* decision of the *Legislature;* "The result of the deliberations of all collective bodies, must necessarily be a compound as well of the errors and prejudices, as of the good sense and wisdom of the individuals of whom they are composed." *No. 85 of Federalist.* And, "the *degree* in which a measure is necessary, can never be a *test* of the legal right to adopt it; that must be a matter of opinion, and can only be a test of expediency. The relation between the *measure* and the *end;* between the *nature* of the *mean* employed towards the execution of a power, and the object of that power, must be the criterion of constitutionality, not the more or less of *necessity* or utility." A "restrictive interpretation of the word necessary, is also contrary to this sound maxim of construction; namely, that the powers contained in a Constitution of government, especially those which concern the general administration of a country, its finances, trade, defence, &c., ought to be construed liberally *in advancement of the public good.* This

60      v.15

rule does not depend on the particular form of government, or on the particular demarkation of the boundaries of its powers, *but on the nature and objects of government itself.*" *Hamilton's opinion to President Washington, Feb. 23rd,* 1791.

These canons of interpretation have been received and acted upon with approbation by the courts of the several States, and by the Supreme Court of the United States.

If, therefore, the Legislature had the constitutional power to pass the particular law in question, then it was with the Legislature, and with it *alone*, to determine whether or not there existed a *necessity* for its passage; its judgment in the matter being conclusive in regard to *that fact*.

If the Act be obnoxious to any objection which makes it the duty of this court to pronounce it inoperative, it must be so, because of a *want* of *power* in the Legislature to enact it. "What is a power but the ability or faculty of doing a thing? What is the ability to do a thing, but the power of employing the *means* necessary to its execution? What is a *legislative* power, but a power of making laws? What are the means to execute a *legislative* power, but laws? What is the power of laying and collecting taxes, but a *legislative* power, or a power of *making laws* to lay and collect taxes? What are the proper means of executing such a power, but *necessary* and *proper* laws?" *No. 33, Federalist*.

The object of the Act of last session is to provide a permanent police for the city of Baltimore, so as to ensure the protection of the rights, persons and property, of its inhabitants. Of the *necessity* for such a law, the courts are not to be the judges, and for the reasons we have given. But it is unmistakable that the *character* of the law, and the *power* to pass it, fall directly within the category of question and answer we have quoted. Adopting it as a just and proper standard, we can have no difficulty in deciding that both the law and power are, in their nature, *strictly legislative*, and that *unless* there be some *express* or necessarily *implied* inhibition against the one or the other, or both, to be found in the Constitution of the United States, or of the State of Maryland, the law must stand relieved from all judicial censure.

Such prohibitions, it is urged, are to be found. Those suggested will be examined in the order in which they were presented at the bar.

It is a well established principle of judicial construction, that before an Act of the Legislature ought to be declared unconstitutional, its repugnancy to the provisions or necessary implications of the Constitution, should be manifest and free from all reasonable doubt. If its character, in this regard, be questionable, then comity and a proper respect for a co-ordi· nate branch of the government, should determine the matter in favor of the action of the latter.

This doctrine has been uniformly held. It was remarked by *Chief Justice Buchanan,* in the case of the *Regents of the University of Maryland,* 9 *Gill & Johnson,* 383, that it had been said, "that a legislative Act should not be pronounced unconstitutional or invalid, in a doubtful case, nor should it, where the doubt is *bona fide* and well founded, and not the result of a disinclination to deny the authority of the Legislature, which all must feel, but none should yield to, in violation of a solemn duty. But where a judge is satisfied, upon full consideration, that an Act of the Legislature is contrary to the Constitution of the United States, the supreme law, which he is bound to obey, and which must prevail over any Act that comes in conflict, and cannot stand with it, or for any other reason invalid, he has no choice; and all that is left him, is honestly and fearlessly to do his duty; from the faithful discharge of which, however unpleasant the task, no upright judge can shrink if he would. On the other hand, a judge should not suffer himself to be betrayed to pronounce an Act unconstitutional or invalid on insufficient grounds, by *a morbid apprehension that a contrary decision might be ascribed to the want of a just and proper sense of judicial duty.*" In the case of the *State use of Washington county, vs. Baltimore & Ohio Railroad Co.,* 12 *Gill & Johnson,* 438, the court, whilst recognizing the obligation, under certain circumstances, to pronounce against the validity of an Act of the Legislature, says, that "to declare an act of a co-ordinate department of the government an unwarrantable

assumption or usurpation of power, because it is a violation of a constitutional prohibition, is an exercise of the judicial office of a grave and delicate nature, *which never can be warranted but in a clear case.*"

It has also been generally held, that contemporaneous interpretation furnishes reliable light as to the meaning of a clause otherwise involved in obscurity or doubt. "Cotemporaneous expositions of doubtful provisions, in all instruments, and particularly in legislative enactments and constitutional charters, are held to be legitimate and useful sources of construction." *Opinion of the Justices of the Supreme Judicial Court of Massachusetts, on questions submitted to their consideration,* 3 *Pick.,* 518; *Kiersted and others vs. The State;* 1 *Gill & Johnson,* 248; *Hays vs. Richardson;* 1 *Gill & Johnson,* 385.

It is essential these rules of interpretation should be borne in mind, when a clause of our State Constitution is under consideration.

One of the objections urged to the Act—and one, too, which goes to its entire existence—is, that the appointment by the Legislature of the Commissioners named in it, is a violation of the Constitution, not only because it is an usurpation of powers, which, in their nature, are administrative or executive, but is in conflict with the express language of the Constitution itself.

Both aspects of the objection may be viewed together. The political aphorism, that the several departments of the government ought forever to be kept separate and distinct, has been alluded to already in this opinion, and its meaning sought to be fixed in accordance with the apprehension had of it by those who had the largest share in incorporating it in the forms of government of these States. That the explanation given is the true one, will be apparent from a consideration of the Constitutions of some of the States, and especially of that of Maryland.

In the year 1782, the State of Georgia passed an Act inflicting penalties on, and confiscating, the estates of such persons as were therein declared guilty of treason; among these

was one Cooper, who, in 1797, brought suit to recover the amount of a bond which he held of one Telfair, of Georgia. To his right of recovery the Act of 1782 was pleaded as a bar. On the case being carried up to the Supreme Court of the United States, on the part of the plaintiff it was contended, that the Act of 1782 was unconstitutional, because it violated the first Article of the Constitution of Georgia, which was in these words: "The legislative, executive and judiciary departments shall be separate and distinct, so that neither exercise the powers belonging to the other."

It was urged that the Act was one of banishment and confiscation; that it was not, in its nature, legislative, but judicial, and, as such, being passed by the Legislature, a violation of the Constitution of the State. Without a dissentient voice, the validity of the law was upheld, the judges delivering their opinions *seriatim.* A few extracts from these will affirm what has heretofore been observed in relation to the delicacy of declaring a law unconstitutional. *Washington,* J., said: "The presumption, indeed, must always be in favor of the validity of laws, if the contrary is not *clearly demonstrated;*" and *Patterson, J.:* "It must be a *clear* and, *unequivocal* breach of the Constitution, *not a doubtful and argumentative implication.*"

The 11th section of the second Article of the present Constitution of the State, is as follows:

"He (the Governor) shall nominate, and, by and with the advice and consent of the Senate, appoint all civil and military officers of the State, whose appointment or election is not herein provided for, *unless a different mode of appointment be prescribed by the law creating the office.*"

On behalf of the respondents it is contended, that the Governor, under this section, has the power "to fill all offices in this State, whether created by the Constitution or by the Acts of Assembly, unless otherwise provided for by one or the other." The meaning of this is not very clear, if it is to be taken as inconsistent with a power in the Legislature to appoint to an office created by it, if the mode of such appointment be not provided for by the Constitution. But if

it is to be understood as asserting that, although the Legislature has the right to create offices not forbidden by the Constitution, yet it has not the right, by *appointment*, to fill them, but must designate some other authority or person to do so, there is no sufficient warrant in the Constitution for any such idea. Apart from the plain and unambiguous language of the Constitution, it would be difficult to imagine what possible good could arise from such an interdiction of the power of appointment in the Legislature, whilst with it should be left the power of designating those by whom the appointing power should be exerted. In either case the power would be substantially and practically with the Legislature; in the one, it would be exercised directly, while in the other, it would be by the designation of persons who would exercise it by the appointment of those who might be previously agreed upon. But, in truth, the objection answers itself. *What, in point of fact, is the designation of a body or person to make appointments, but the appointment of such body or person?*

The view of the respondents is unsustained by authority, whilst the opposite of it is fully sustained, not only by the unequivocal language of the Constitution, but by judicial decision, and the practice of the State ever since the formation of its government.

The section gives to the Governor the power of appointment in all cases except two:

1. Those officers whose appointment is otherwise provided for *in* the *Constitution.*

2. Those officers, the mode of whose appointment is otherwise *prescribed* by the law *creating* the office. The obvious definition of the word *"prescribed,"* as used in the section quoted, is *"ordered."*

The question then is, has the *"law creating the office"* of Commissioners of the Board of Police, prescribed the mode of appointment to it? It has done it in the simplest and most direct manner, by appointing the persons in the Act *creating* the office; and its authority for doing so, independently of all other considerations, can be drawn from the words in the section following the word *"unless."*

## DECEMBER TERM, 1859.                479

Mayor, &c., of Balto. *vs.* State, *ex rel.* of the Board of Police of Balto.

The Constitution of 1776, was quite as strong in its language as the present, adopted in the year 1851. The sixth section of the Declaration of Rights declared: "That the legislative, executive and judicial powers of government, ought to be forever separate and distinct from each other," and yet under it, almost any number of Acts, making appointments, were passed, the constitutionality of which has never been denied, and under which immense possessions are now held and enjoyed.

Independently of the *express* authority conferred by the existing Constitution on the Legislature, to prescribe the mode of appointment to any office it *may create*, on general principles, where the power is not distinctly, or by unavoidable implication, forbidden to it, it would possess it. "The legislative department is nearest the source of power, and is manifestly the predominant branch of the government." *Crane vs. Meginnis,* 1 *Gill & Johnson,* 472. "It is a sound political proposition, that wherever the legislative power of a government is *undefined,* it includes the judicial and executive attributes," *per Patterson, J.,* 4 *Dallas,* 19. "Plenary power in the Legislature, for all purposes of civil government, is the rule. A prohibition to exercise a particular power, is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden." *The People vs. Draper,* 15 *New York,* 543.

There is nothing, in all this, in anywise in conflict with the case of *The State, ex rel. Attorney General vs. Kennon,* 7 *Ohio, (New Series,)* 547. There, the obnoxious Act was palpably in opposition to the plain words of the Constitution. The Constitution—unlike, in this particular, that of Maryland—expressly declares, "no appointing power shall be exercised by the General Assembly, except as prescribed in this (its) Constitution, and in the election of United States Senators." This language is so plain as to admit of but one construction: in *no instance,* but those distinctly specified, was the General Assembly to exercise the power of appointment. It is given to the Legislature of this State to prescribe the

mode of appointment by the law creating the office.   No
two things could be more dissimilar than are the Constitu-
tions of Ohio and Maryland, in this respect.

These observations sufficiently dispose of the objection to
the mode of appointment of the Commissioners mentioned
in the Act.

The next exception to the Act is founded on the 19th sec-
tion of the 4th Article of the Constitution, which, after
making provision that the Legislature shall fix the number
of justices of the peace, and constables, for each ward of
the city of Baltimore, and for each election district in the
several counties, and declaring that they shall be, by virtue
of their offices, conservators of the peace in the counties
and city of Baltimore, respectively, the filling of vacan-
cies occurring in their number, and other things concern-
ing them, declares: *"And the Mayor and City Council may
provide, by ordinance, from time to time, for the creation
and government of such temporary additional police, as
they may deem necessary to preserve the public peace."*

Now it is manifest, the power *given* to the Mayor and
City Council is to *create* and govern a *temporary additional,*
and not a *permanent* police, as contra-distinguished from it.
Moreover, the police which they are authorized to create, is
not only to be *temporary* in its duration, but is to be *addi-
tional* to something already in existence, whenever, from
time to time, it may be necessary to summon it *"to preserve
the public peace."*

It is difficult to understand how that which is declared to
be but *temporary* and *additional,* can be considered as
*permanent, original* and *independent.*   The proposition in-
volves a contradiction in itself; and yet it must be so, unless
the power be reserved to the *State* to provide a permanent
police for the city of Baltimore.

We are to give a common sense interpretation to the action
of the framers of the Constitution, and to that of the people
who adopted it.   We are to presume they understood the ex-
isting condition of the law, applicable, as well to this as to
other subjects of public interest, in regard to which they were

to employ their judgments and express their opinions. This sentiment of deference and justice is not for the first time to be acknowledged. *State vs. Mace,* 5 *Md. Rep.,* 351. *Manly vs. State,* 7 *Md. Rep.,* 147. *Duramus vs. Harrison & Whitman,* 26 *Ala.,* 326. *Bandel vs. Isaac,* 13 *Md. Rep.,* 202.

In view of these decisions, no less than the apparent propriety of the thing, we are to assume that the Convention had knowledge of the fact that, under laws then on the statute book, a police, permanent in its character, was in existence, and if so, that whilst it was not meant to deprive the State of the power either to augment or diminish its number, it was deemed but prudential and proper to provide against sudden emergencies and outbreaks of popular rage, by conferring on the Mayor and City Council the power to create a *temporary* and *additional* force, for meeting the one and repressing the other. The very language employed clearly denotes, that the thing to be created was to be one of activity, of short duration, and which, after having accomplished the purpose of its enrolment, was to be disbanded into the general body of the community from which it was taken for the preservation *"of the peace,"* suddenly threatened to be, or actually disturbed.

Were this not so, and had it been the intention of the Constitution to deprive the State of all power in the establishment of a police in the city of Baltimore, and to confer it on the corporation, nothing was easier of accomplishment. But a few words were required to do it. But this not being its purpose, language was used suitable to the expression of the idea, that to meet successfully any unusual tax upon the energies of the public authorities, to suppress tumults and like disturbances, they should have the faculty of invoking, for the time, an *additional* force, which, as it was to be employed in guarding against unusual excitements and in resistance to inflamed and maddened feeling, like them its subsistence was anticipated to be but *temporary.* The reasonableness of the power is its justification. It never could have been the purpose of any very considerable portion of the people of the State, to deprive *its* government of

the capacity of fulfilling one of its primary and most important obligations to its citizens.    And as was justly said in *The People vs. Draper,* 1 *Smith,* 544, 545, "As a political society, the State has an interest in the repression of disorder, and the maintenance of peace and security in every locality within its limits; and if, from exceptional causes, the public good requires that legislation, either permanent or temporary, be directed toward any particular locality, whether consisting of one county or of several counties, it is within the discretion of the Legislature to apply such legislation, as in its judgment the exigency of the case may require, and it is the sole judge of the existence of such causes." * * * "It follows that it belongs to the Legislature to arrange and distribute the administrative functions, committing such portions as it may deem suitable, to local jurisdictions, and retaining other portions to be exercised by officers appointed by the central power, and changing the arrangement, from time to time, as convenience, the efficiency of administration and the public good, may seem to require. If a particular act of legislation does not conflict with any of the limitations or restraints which have been referred to, it is not in the power of the courts to arrest its execution, however unwise its provisions may be, or whatever the motives may have been which led to its enactment." * * * "If a given act of legislation is not forbidden by express words, or by necessary implication, the judges cannot listen to a suggestion, that the professed motives are not the real ones."

In answer to this it is urged the Constitution, itself, points out the police to which that now existing in the city of Baltimore is to be considered as *additional;* that this police consists of the *justices* of the *peace* and *constables* of the respective wards, who are declared, by virtue of their offices, conservators of the peace.    This view cannot be upheld, if it be recollected that, at the very time the clause referred to was, with the rest of the Constitution, adopted, there was a police force in operation other than justices of the peace and constables, organized and supported by the authority conferred on the Mayor and City Council of Baltimore by the

Act of the Legislature of 1812, ch. 194; which Act was continued in force by the third Article of the Declaration of Rights. It was to that police, or any other which the Legislature might establish in augmentation or in lieu of it, to which the *temporary additional* police was to be subjoined and made appendant. The mere fact of the 19th sec. of the 4th Art. declaring, what would be equally true in the absence of any declaration on the subject, that justices of the peace and constables are conservators of the peace, is not perceived as affording any aid to the theory that they are the contemplated permanent police. Neither their numbers, nor the daily calls upon their time, as strictly judges, and executive officers for the service of process, justify the opinion that they were looked to as adequate to the performance of all the ordinary police duties of so large a city as Baltimore. So far back as the year 1812, experience had demonstrated that a force of one hundred men was necessary. Surely, the large increase of population and the occurrences subsequently to that time, could furnish no reason for diminution of the number of the police, and none was made. The justices and the constables were proclaimed, as were the judges, conservators of the peace. It was a needless declaration, and doubtless made only from abundant caution.

That it was the general understanding that the regular police of the city was that authorized by the Act of 1812, is apparent from the passage of the Act of 1853, ch. 46, entitled, "An Act to provide for the better security of life and property in the city of Baltimore, by increasing and arming the police force thereof." It repealed the Act of 1812, ch. 194, which limited the appointment of city bailiffs to the number of 100, and at the same time left the number to the unrestricted discretion of the Mayor and City Council, and authorized the arming of the police. Under this Act of 1853, the city acted, and for the first time increased the number of the police beyond one hundred, and gave them arms. No one disputed the constitutionality of that Act; and inasmuch as the Constitution has undergone no change since its passage, it is impossible to perceive how it has come to be, that a

power belonging to the Legislature of 1853 is denied to that of 1860.

When the number of the force existing at the time of the adoption of the Constitution is considered in connection with the Act of 1852, ch. 274, which assigned to the whole city of Baltimore twenty-four justices and forty-four constables, sixty-eight in all, and thirty-two less than the number of the police force under the Act of 1812, it is next to impossible to believe, that it was intended these justices and constables should constitute the *permanent police* body of Baltimore.

On the whole then, it is, but fair to assume, that the purpose of the 19th section of the 4th Article of the Constitution, in its reference to justices of the peace and constables, so far as the city of Baltimore is specially concerned, was merely to provide for an adequate number to perform the duties it had been customary to assign to them prior to the adoption of the Constitution, and not to withdraw them from such duties and appropriate them to the discharge of the more complicated and laborious offices of the ordinary policeman, such as had been executed under the Act of 1812, and the ordinances passed in pursuance of the authority which it conferred. The section leaves with the State its police power, subject only to one limitation, or rather, more correctly speaking, to the participation of the Mayor and City Council of Baltimore in its exercise, in certain emergencies, by the appointment of a temporary additional police.

It is said that the proviso to the sixth section of the Police Act, which provides, "That no *Black Republican*, or supporter of the *Helper Book*, shall be appointed to any office under said Board," vitiates the whole of it, because it adds to the disqualifications for office prescribed by the Constitution.

Were this court permitted to gather from newspapers and partizan harangues the information on which to pronounce its judgments, it might be able to determine what is meant by a "*Black Republican*," and a supporter of the "*Helper Book*;" but these are sources of intelligence denied to it. It has no judicial knowledge of their signification. As they

stand in the Act, they are unintelligible and seemingly incapable of definition, and, for anything appearing, wholly inconsistent with its general scope and object.

There is no such crime known to the laws of Maryland, as that of being a "Black Republican," or "a supporter of the Helper Book." If the Helper Book be an inflammatory appeal to the passions of the servile portion of our population, it is (if it shall deem it expedient to do so) for the Legislature to prescribe the punishment for such *white* persons as shall be convicted of having it in their possession. The Act, among other qualifications, requires that the appointees under it shall be *white* men; and there is nothing in the Code making it criminal in them, either to sympathize with, or endorse the sentiments contained in the Helper Book.

Judicially uninformed of the meaning of the words, nothing can be pronounced in regard to them but this, that if under them the true names of crimes are cloaked and concealed, of course, on their exposure, the parties convicted of them would suffer whatever of disability the Constitution and laws denounce against them, and if it be of such a degree as to disqualify for office, the prohibition would be constitutional and proper. But, if they be construed to include an unconstitutional prohibition, or are, in a legal point of view, nonsensical and impertinent, under the decisions of this court, they are to be excluded from the Act, without impairing the efficiency of the remainder of it. In either aspect, they constitute no valid objection to the law. *Davis vs. The State,* 7 *Md. Rep.,* 151.

The power given to the Commissioners, in a certain contingency to issue certificates of indebtedness, is not properly before the court on this appeal. No such certificates have been, or may ever be, issued. It might perhaps be time enough to pronounce judicially in regard to it, when the validity of such certificates is contested, which cannot occur until they have an existence by the utterance of them. But the question has been most fully argued at the bar, and, were it necessary for the determination of this case, there ought to be no hesitation in deciding, that such certificates of indebt-

edness are not within the purview of the constitutional interdict, as expounded by the Supreme Court of the United States, the tribunal whose judgment is conclusive on all in regard to the matter. *Briscoe & others vs. The President and Directors of the Bank of the Commonwealth of Kentucky*, 11 *Peters*, 257.

Another objection to the Act, is the power it confers on the Board of Commissioners to call out the *militia;* it being alleged that it is an improper interference with the Governor's constitutional prerogative, under the ninth section of the second Article. The section is, in no particular, more comprehensive of power to the Governor than was the 33rd section of the Constitution of 1776. By the latter the Governor was, with the advice and consent of the Council, authorized to embody the militia, and when embodied, was *alone* to have *"the direction thereof."* Under the present Constitution he "may call out the militia to *repel invasion, suppress insurrections, and enforce the execution of the laws;* but shall not take the command in person without the consent of the Legislature." And yet, under the Constitution of 1776, no one doubted the power of the Legislature to authorize the calling out of the militia without the consent of the executive. Accordingly many Acts were passed, making it the duty of subordinate officers to bring their commands into the field, on the requisition of certain civil officers. The following Acts may be referred to as instances of the exercise of the power: 1798, chapter 100, section 10; 1807, chapter 128, section 6; 1813, chapter 19, sections 2 and 5; 1816, chapter 193, section 18; 1823, chapter 188, section 70; 1834, chapter 251, section 57; 1835, chapter 14; 1835, chapter 107.

There is nothing whatever in the Act which abridges the constitutional power of the Governor; he still has, under it, the power to call out the militia, "to repel invasion, suppress insurrections and enforce the laws." The whole scope of the authority given to the Commissioners is not more extensive than that which had been previously conferred on others. The purpose of the delegation is as obvious as it is legiti-

inate.    It is to enable the Commissioners to discharge faithfully an important duty cast upon them, that is the dispersion of tumultuous and riotous assemblages, (whether sudden or preconcerted,) having for their design the outrage of the citizen, either in his person or his property, or both; to sustain in an emergency, the legally constituted authorities in their resistance to the violence of mobs, and the like disorderly bodies.    The arguments adduced to show the dangers possible to flow from an injudicious employment of the authority, would be in no degree weakened if the power were deposited elsewhere.    All delegated power is liable to abuse from the wicked motives, caprice or ignorance, of its depository.    And yet, the very existence of government requires it should be confided to the custody of some one.    The jealous watchfulness of a free people, and the ultimate liability to the injured of those who abuse their trust, together with the innate sense of right which every sane man has, are the only guarantees it is within the province of the law maker to afford the citizen.    In a word, every human contrivance challenges the confidence and trust of those for whose advantage it is intended.    Absolute safety, under every possible phase of circumstances, is not to be expected, because the frailty of mankind will not allow it.    Government itself, in one sense, is an evil, but it is a *necessary* one, and must be borne for the general good it secures.

If the section conferring the power on the Board, were condemned, then there would be no authority with the civil officers in Baltimore to call out the militia to suppress any sudden outbreak, the Legislature having, at its last session, by Act of 1860, chapter 6, repealed the seven hundred and sixth section of the fourth Article of the Code of Public Local Laws, which gave to the Mayor of the city of Baltimore, and the judge of the Criminal Court of Baltimore, and the judge of the Superior court of Baltimore, the power to order out the militia.    The effect of this law, taken in connection with the Police Act, is to confine the power, so far as the city of Baltimore is concerned, to the Governor and the Commissioners of the Board of Police.

488 MARYLAND REPORTS.

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

Another constitutional objection is to the provision, making it the sheriff's duty to act under the Board in the preservation of the public peace and quiet, and to call out the *posse*, if required by them, and enabling the Board, whenever the exigency, in their judgment, warrants it, to assume the control and command of all conservators of the peace in the city.

The 20th section of the fourth Article of the Constitution, which mentions the office, and provides for filling it, does not specify or describe the powers and duties of the sheriff. These are left to the common law and the Acts of Assembly. The charge of the other conservators of the peace is nowhere, in the Constitution, given to him. There is nothing to prohibit the Legislature from adding to or diminishing his duties, provided those added be not in conflict with his office as sheriff. And what was said in Georgia of the office of sheriff in that State, is equally applicable to that officer and his duties in Maryland. In the case of *State vs. Dews, R. M. Charlton's Rep.*, 404, it was said by the court:

"It is true that the appointment of sheriff confers upon him the right to execute the duties of the office, but, from the nature of the office, those duties may be changed by law. It is, in this State, a purely ministerial office, whose function and province is to execute duties prescribed by law. From the very nature of such an office, its powers are the result of its duties; in reference to it, the maxim is strictly true, that 'Power and duty are correlative,' but its powers do not extend beyond, they are the mere consequence of its duties. The holder of such office has power only to execute its duties, and because such duties are prescribed to and imposed on him. The idea that the duties of a ministerial officer cannot be changed, will involve an inversion of the order of things, and be a flagrant absurdity; it would invest him, who is a mere minister and servant, with authority to limit the power of, and exercise an over-mastering control over, those from whom he is to receive the law. Those duties are the mere creatures of law, and are, in their very essence, changeable by the law-making power; and his rights, which are derivative only from those duties, cannot prevent their

·DECEMBER TERM, 1859. 489

Mayor, &c., of Balto. vs. State, ex rel. of the Board of Police of Balto.

creation or change. His rights, which are the consequence of his duties, cannot intercept the authority of the Legislature to act on 'those duties." Besides all this, "every citizen summoned by an executive officer to aid him in the preservation of the public 'peace, or in the service of civil or criminal process, or in the arrest of a felon, is bound to perform the service required, although it may subject him to danger, as well as additional labor, trouble and expense." *The State vs. Mayhew, 2 Gill,* 501.

The question next in order to be considered is, whether the use of the property ought to be given, as demanded in the petition for the *mandamus.* It was in the discussion of this question, one of the counsel for the respondents, Mr. Schley, whilst animated by a zeal indignant against what he considered a violation of the great universal law which distinguishes right from wrong, "*quod semper, quod ubique, quod ab omnibus creditum est,*" poured forth, in warm language, his denunciation of the purpose and effect of the section, as if it wrought a spoliation of what he, and those whom he represented, held sacred as their right. None who heard it could have failed to appreciate the eloquence, nor the fervor which gave to it the charm of a forcible utterance. Its influence on the bench was, as it should have been, but momentary, and the question, in its original simplicity, re-appeared for the calm judicial disposal.

The petition for the *mandamus* states, that the persons designated in the Act as Commissioners, organized as a Board on the sixth of last February, and that, to enable them to discharge the duties cast upon them, they need the use of the station-houses, and other buildings specified by them. The prayer for the *mandamus,* which *the writ must follow,* is, that the court will issue "the writ of *mandamus* to the Mayor and City Council of Baltimore, commanding and enjoining them, the said Mayor and City Council, immediately after the receipt thereof, and without delay, to furnish and allow to the Board of Police of the city of Baltimore, for the police now under its exclusive management and control, as well the use of the Fire Alarm and Police Telegraph in said city, as of

62    v. 15

all the station-houses, watch-boxes, arms, accoutrements and other accommodations and things provided by the said Mayor and City Council of Baltimore, for the use and service of the police created by it, as fully and to the same extent as the same, at the time of the passage of said Act, were or might be used by or for the said city police."

The right to the *use* demanded, is given by the express language of the 12th section of the Act, and the only question, therefore, is: Had the Legislature the constitutional power to provide, as it has, for it?

The property was purchased with the money of owners of property, and for the use and benefit of the community at large. Its dedication is to the public. It belongs, in fact, to the people, although for its more effective use and protection, the legal title to it is vested in the corporate authorities of the city. Those authorities, for reasons deemed sufficient, were brought into existence just as has been the Board of Commissioners, for the public good. Any power given to the latter, by the Act of their creation, is on the same limitation as that conferred on the Mayor and City Council by their charter; that is to say, both owing their origin to a legislative Act, the powers conferred by it, in each case, are held subject to the revision, modification, or repeal of the body from whence they have been derived. In other words, they are political powers, held and exercised for political purposes by *political* or *municipal* bodies as distinguished from *private* corporations. *"Public* corporations are such as are created by the government for political purposes, as counties, towns and villages, and the whole interest in them belongs to the public." 2 *Kent's Com.,* 275. *"Over public property* they (the States) have a disposing power," *per Justice Patterson,* 2 *Dallas,* 320. *Mr. Justice Story,* in delivering the opinion of the court in 9 *Cranch,* 52, says: "In respect also to *public* corporations, which exist *only for public purposes,* such as counties, towns, cities, &c., the Legislature may, under proper limitations, have a right to change, modify, enlarge or restrain them, *securing, however, the property for the use of those for whom, and at whose expense, it was originally purchased.*"

The Act of the last session has preserved the property for the use of those for whom, and at whose expense, it was purchased. The only change effected in regard to it is as to the persons who shall have the control and management of it. The *use* of it is in no manner altered. A multitude of decisions could be brought forth from every section of this country and England, showing the difference between public and private corporations. In 9 *Gill and Johnson*, 401, it is said: "*Public* corporations are to be governed according to the laws of the land, and the government has the sole right, as trustee of the public interest, to *inspect, regulate, control and direct the corporation, its funds and franchises.* That is the *essence of a public corporation.*" And again: "A public corporation is one that is created for political purposes, with political powers, to be exercised for purposes connected with the public good in the administration of civil government; *an instrument of the government, subject to the control of the Legislature,* and its members officers of the government for the administration or discharge of public duties, as in the cases of cities, towns," &c. Under the Constitution of Maryland the city of Baltimore is recognized as a public corporation, established for public purposes, and in this character it is in nowise distinguished from that of the several counties; and, except in so far as may be forbidden by the Constitution, like them it is liable to the control of the Legislature. Were this not so, civil government would be an impossibility, because of conflicting claims to the supreme power urged by the different geographical departments into which the State is separated. The power (under the limitations alluded to) which creates, can revise, modify, annihilate; it can change, not only the limit, but the nature of the power, and also the depository of it. *Mr. Justice Story,* in *Dartmouth College vs. Woodward,* 4 *Wheaton,* 693, says: "It is admitted, that the State Legislatures have power to enlarge, repeal and limit the authorities of public officers in their official capacities, in all cases, where the Constitutions of the States, respectively, do not prohibit them; and this, among others, for the very reason, that there is no express

or implied contract, *that they shall always, during their conuance in office, exercise such authorities.* They are *to exercise them only during the good pleasure of the Legislature.*" These views are fully sustained in this State by many decisions, and, necessarily so by that of *The Mayor & City Council of Baltimore vs. Robert Lemmon,* unreported; *The State, use of Washington County vs. Baltimore and Ohio Rail Road Co.,* 12 *Gill and Johnson,* 399; and by that pronounced, at this term, in the case of the *Governors and Visitors of St. John's College, ante.,* 330. They are sustained in all of the following cases, with more or less distinctness. 11 *Iredell,* 563. 3 *Hill,* 531. 23 *Connecticut,* 416. 17 *Georgia,* 56. 22 *Georgia,* 506. 13 *B. Munroe,* 1. 12 *Louisiana Annual Reports,* 515. 4 *Scammon,* 269; and to use the language of the court in 3 *New Hampshire,* 532: "Towns are public corporations, created for purposes purely public, empowered to hold property, and invested with many powers and faculties, to enable them to answer the purposes of their creation. In the creation of such corporations, there must, in the nature of things, be reserved by necessary implication, a power to modify them in such manner as to meet the public exigencies. There would be great absurdity in the supposition, that corporations, created by the Legislature for purposes purely public, could not be modified and altered, from time to time, as the public convenience or necessity might require. *A power to alter and change such a corporation, and adapt it to the purposes it was intended to accomplish, is implied in its very nature.*" "They (the Legislature) have also under their control the disposition of its corporate property, or that which is held for municipal and corporate purposes." 29 *Vermont,* 19.

In the demand made in the case now before the court, there is *no perversion of the use of the property;* but, on the contrary, it is to be continued in that for which it was *purchased* and is now held, and in none other.

The objection that the Legislature had no right to delegate any portion of the taxing power to the Board of Police, is fully answered by the decisions of the late Court of Appeals.

Mayor, &c., of Balto., *vs.* State, *ex rel.* of the Board of Police of Balto.

In the case of *Burgess .vs. Pue*, 2 *Gill* 19, the court say: "We think there was no validity in the constitutional question which was raised by the appellee's counsel in the course of his argument, relative to the competency of the Legislature to delegate the power of taxation to the taxable inhabitants, for the purpose of raising a fund for the diffusion of knowledge and the support of primary schools. The object was a laudable one, *and there is nothing in the Constitution prohibitory of the delegation of the power of taxation*, in the mode adopted, to effect the attainment of it; we may say that grants of similar powers to other bodies, for political purposes, have been coeval with the Constitution itself, and that no serious doubts have ever been entertained of their validity. It is therefore too late, at this day, to raise such an objection." See, also, the case of *The State vs. Mayhew*, 2 *Gill*, 487, where the same doctrine is fully sustained.

The opinion of the learned judge, who decided this case in the Superior Court, shows the bestowal of great care, and his usual ability in its preparation. The views there taken, are in full concurrence with those herein presented. The judgment pronounced by him must be affirmed.

As it was agreed that the case at the relation of the Mayor and City Council of Baltimore, as well as that at the relation of Charles Howard and others, should be considered as submitted for the decision of this court, and inasmuch as all the questions applicable to both, have been considered and decided, the order of the Superior Court in the former, as well as that in the latter, is to be affirmed.

*Order affirmed in each case.*

(Decided April 17th, 1860.)